KELLY, Circuit Judge.
The government appeals from the district court's decision granting Defendant-Appellee Ollisha Easley's motion to suppress physical evidence and incriminating statements. The district court held that Ms. Easley was seized in violation of the Fourth Amendment and that the evidence obtained was tainted by her preceding illegal arrest. Our jurisdiction arises under 18 U.S.C. § 3731 and we reverse.
Background
On March 10, 2016, Defendant-Appellee Ollisha Easley was onboard a Greyhound bus from Claremont, California, to her hometown of Louisville, Kentucky, when the bus made a scheduled stop in Albuquerque, New Mexico. United States v. Easley, 293 F.Supp.3d 1288, 1292 (D.N.M. 2018). The Greyhound passenger list showed that Ms. Easley's reservation included a second woman identified as "Denise Moore"-both Ms. Easley and Denise Moore had one checked bag and both tickets were purchased with cash. Id. at 1293. No one named Denise Moore boarded the bus in California, but her suitcase was stowed in the luggage hold of the Greyhound and was identified with the same reservation number and telephone number as Ms. Easley's luggage. Id. at 1293-94.
While the bus was stopped in Albuquerque, Special Agent Jarrell Perry of the Drug Enforcement Agency (DEA) and his partner that day, Special Agent Scott Godier, observed the luggage in the bus's cargo hold. Id. at 1293. Agent Perry had reviewed the bus's passenger list before arriving at the Greyhound station in Albuquerque and noted that Ms. Easley and Denise Moore were traveling on the same reservation, purchased with cash. Id. Agent Perry later testified that the use of a so-called "phantom passenger" is a common method of narcotics trafficking-the drugs are transported in the suitcase of the fictitious passenger who never boards the bus, presumably in an attempt to give plausible deniability to the actual drug trafficker. 2 Aplt. App. 143-44. Among the checked luggage, Agent Perry observed a gray "Rome Essentials" brand suitcase with Ms. Easley's name and a black and tan "G" brand suitcase with Denise Moore's name. Easley, 293 F.Supp.3d at 1293. He observed that both bags had identical travel information and listed identical phone numbers. Id. Agent Perry later testified that their origin in California (in his opinion, a common source for narcotics) and terminus in Louisville (a destination *1078 city for illegal drugs) piqued his interest in their reservation. 2 Aplt. App. 144.
The passengers disembarked while the bus was serviced during the stopover, and when Ms. Easley reboarded, Agent Perry and Agent Godier were onboard-Agent Godier stood at the front of the bus while Agent Perry stood at the rear. Easley, 293 F.Supp.3d at 1292-93. Both agents were in plainclothes and no firearms were visible. Id. at 1293. Agent Perry questioned and searched approximately 15 passengers and their belongings before he approached Ms. Easley. Id. All of the passengers questioned before Ms. Easley consented to searches by Agent Perry. Id. at 1294.
When Agent Perry spoke with Ms. Easley he asked her the origin and destination of her travel, whether she was traveling with anyone, if she had checked any luggage, whether he could search any checked luggage she had, whether she had any personal items with her on the bus, and whether he could search those personal items. Id. Ms. Easley responded that she was traveling alone and that she had only checked one bag and identified her backpack and pillows as her only personal belongings. Id. She consented to the search of her personal belongings, her jacket, and around her waist and legs, and she gave Agent Perry permission to search her checked bag in the luggage hold. Id.
After Agent Perry was finished speaking with the other passengers, he exited the bus and retrieved Ms. Easley's gray suitcase from the luggage compartment and searched it, finding no contraband. 2 Aplt. App. 162. Agent Perry then spoke with the bus driver, who confirmed that Denise Moore had not boarded the bus with Ms. Easley. Easley, 293 F.Supp.3d at 1294. Agent Perry then approached Ms. Easley for a second time and asked if she would speak with him outside the bus. Id. Ms. Easley agreed. 2 Aplt. App. 326-27. Agent Perry questioned Ms. Easley again about her travel plans, asked to see her identification, and asked for permission to search her purse, which she granted. Id. at 326-29. Finally, Agent Perry asked Ms. Easley if she was the owner of the black and tan suitcase checked under Denise Moore's name. Id. at 329. Ms. Easley responded that she was not; in response to Agent Perry's questioning she said that she did not know who the bag belonged to, did not have any interest in it, did not care what happened to it, that no one had given her the bag, and that she had never seen the bag before. Id. at 329-30. Ms. Easley then returned to her seat on the bus and Agent Perry proceeded to search Denise Moore's bag. Easley, 293 F.Supp.3d at 1294. Hidden in the suitcase were bags of methamphetamine. 2 Aplt. App. 165. Agent Perry then reentered the bus and arrested Ms. Easley. Easley, 293 F.Supp.3d at 1294. Following her arrest, Ms. Easley was taken to the DEA office in Albuquerque where she confessed to her agreement to transport the luggage containing methamphetamine from California, described the other individuals with whom she had worked, and explained what had occurred before she boarded the bus in California. Id. at 1296.
On March 23, 2016, Ms. Easley was indicted for possession with intent to distribute 500 grams or more of a substance containing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Id.; see also 1 Aplt. App. 10.
On May 23, 2016, Ms. Easley moved to suppress the evidence seized from the Denise Moore suitcase and to exclude the confession she made to Agent Perry. Easley, 293 F.Supp.3d at 1296 ; see also 1 Aplt. App. 11. Ms. Easley argued that Agent Perry had violated her rights under the Fourth, Fifth, and Sixth Amendments. See id.
*1079 On January 10, 2018, the district court granted Ms. Easley's motion to suppress. See generally Easley, 293 F.Supp.3d 1288. The district court first held that Ms. Easley had not established that Agent Perry illegally searched her bags while the bus was in the wash bay; nor had she established that the bus was subject to an unreasonable investigatory detention. See id. at 1297-98. The court also held, however, that under the totality of the circumstances Ms. Easley had been illegally seized. See id. at 1298. The district court found that Ms. Easley's abandonment of the Denise Moore suitcase was the product of the preceding Fourth Amendment violation, and so it suppressed the evidence seized from the suitcase. Id. at 1298. The district court also determined that the earlier Fourth Amendment violation tainted Ms. Easley's subsequent confession and suppressed her inculpatory statements. Id.
Discussion
When reviewing a district court's decision to grant a motion to suppress, this court reviews factual findings for clear error and legal determinations de novo. See United States v. Thompson, 524 F.3d 1126, 1132 (10th Cir.2008). For factual findings, this court views the evidence in the light most favorable to the district court's decision. See United States v. Augustine, 742 F.3d 1258, 1264-65 (10th Cir.2014).
There are three distinct but interrelated questions in Ms. Easley's case. First, whether she was illegally seized in violation of the Fourth Amendment. Second, whether she voluntarily abandoned the Denise Moore suitcase containing methamphetamine. Third, whether her confession was tainted by a preceding Fourth Amendment violation.
The resolution of each of these questions depends on the threshold determination whether Ms. Easley was illegally seized. If Ms. Easley was seized in violation of the Fourth Amendment, as the district court found, then her abandonment of the suitcase under the second test was per se involuntary and the evidence from the suitcase was properly suppressed. If, however, there was no illegal seizure and her abandonment was voluntary, the suppression of the physical evidence was error. The confession analysis, too, turns on a threshold determination whether Ms. Easley was illegally seized-without a preceding Fourth Amendment violation there could be no taint. We address each question in turn.
A. Seizure
An individual has been "seized" for Fourth Amendment purposes when a reasonable person in the individual's position would not feel free to terminate her encounter with the police and leave. See Halley v. Huckaby, 902 F.3d 1136, 1145 (10th Cir.2018). Such a seizure must be supported by probable cause. Id. If, however, an individual chooses voluntarily to remain and cooperate with the police, the Fourth Amendment's seizure analysis is not implicated. See United States v. Drayton, 536 U.S. 194, 200-01, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). Police officers are permitted to pose questions, ask for identification, and request consent to search even when they have no particular reason to suspect an individual has violated the law. Id. Such an encounter must be assessed under the totality of the circumstances and from the perspective of the objective, reasonable person. See Jones v. Hunt, 410 F.3d 1221, 1225-26 (10th Cir.2005).
Here, none of the traditional indicia of a coercive environment were present in Ms. Easley's interaction with Agent Perry. As the district court summarized:
First, there was no "threatening presence of several officers." To the contrary *1080 only SA Perry approached Ms. Easley, near the back of the bus, while Agent Godier remained at the front of the bus. Second, neither SA Perry nor Agent Godier "brandished" a weapon. SA Perry kept his gun and handcuffs concealed beneath his shirt. Third, in reading the transcript of the audio recording, it would appear that SA Perry did not use "aggressive language." Fourth, SA Perry did not retain Ms. Easley's personal effects for a prolonged period of time, as he searched each item briefly and immediately returned it to her. Fifth the recording and testimony do not indicate that SA Perry blocked Ms. Easley's access to the aisle during the encounter. Finally, the encounter occurred in the presence of other members of the public, namely, the other bus passengers.
293 F.Supp.3d at 1303 (citations omitted). Nonetheless, the district court found that a reasonable person in Ms. Easley's position would not have felt free to terminate her encounter with Agent Perry because: (1) no passenger before Ms. Easley refused to consent to a search by Agent Perry, thus creating a coercive environment; (2) Agent Perry told some passengers (but not Ms. Easley) that he was checking the bus for "security purposes," and this mischaracterization of purpose contributed to a finding that Ms. Easley's cooperation was coerced; (3) Ms. Easley's race contributed to a finding that a reasonable person of color would not have interpreted Agent Perry's request as open to refusal, and that his request took on authoritative and coercive force in the context of a white law enforcement officer speaking to the only black passenger onboard;[1] and (4) Agent Perry did not inform Ms. Easley of her right to refuse to cooperate or consent to a search of her belongings. We do not find these justifications legally adequate.
First, when we speak of a coercive environment, we mean an environment that is the creation of law enforcement conduct. The pressure to cooperate here, if any, was the product of peer pressure , not Agent Perry's behavior. A person has not been seized merely because she feels social pressure to conform her behavior to match that of other passengers on the bus; she is only seized when she submits to an officer's display of authority. See United States v. Salazar, 609 F.3d 1059, 1064 (10th Cir.2010). Here, it is legally irrelevant that every other passenger on the bus cooperated with Agent Perry.[2] Rather, the key inquiry is whether a reasonable person in Ms. Easley's position *1081 would have felt coerced to cooperate given Agent Perry's conduct.
Second, we reject Ms. Easley's contention that a reasonable person would not have felt free to refuse to cooperate because of Agent Perry's characterization of his motives for being onboard the bus. Even if Agent Perry misrepresented his purposes to other passengers on the bus, he did not misrepresent his purpose to Ms. Easley. He specifically asked her whether he could search her bags "for contraband" and never told her that he was searching the bus "for security purposes." See 2 Aplt. App. 313-16. Even drawing inferences from the evidence in a way most favorable to Ms. Easley and assuming she overheard Agent Perry say he was searching the bus for security purposes, it is not at all clear that such a statement rises to the level of a misrepresentation that would create a coercive environment. In finding for Ms. Easley, the district court relied on United States v. Harrison, 639 F.3d 1273 (10th Cir.2011), which involved agents misleading an occupant of an apartment to believe that he was in physical danger from a possible bomb threat. Easley, 293 F.Supp.3d at 1304-05. But deception about a bomb threat is a difference in kind, not merely degree, from Agent Perry stating that he was searching the bus for "security purposes," and clarifying to multiple passengers that he was specifically looking for contraband. See 2 Aplt. App. 291, 293, 297.
Third, we reject Ms. Easley's argument that we should consider subjective characteristics like race as part of our reasonable person analysis. Neither this court nor the Supreme Court has ever considered race a relevant factor in the Fourth Amendment context. Indeed, the Tenth Circuit has specifically disclaimed considerations that could inject the objective reasonable person analysis with subjective considerations: "[W]e reject any rule that would classify groups of travelers according to gender, race, religion, national origin, or other comparable status." United States v. Little, 18 F.3d 1499, 1505 (10th Cir.1994) (en banc).[3] Ms. Easley relies on the Supreme Court's decision in United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), to support her contention that race is a permissible consideration in the seizure analysis. Mendenhall's discussion of race, however, was in the context of assessing voluntariness, not seizure. See id. at 557-58, 100 S.Ct. 1870. While the test for voluntariness of consent accounts for some subjective characteristics of the accused, see Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (noting that the court takes into account the "characteristics of the accused" when assessing voluntariness), the Fourth Amendment's seizure analysis has always been an objective one. See California v. Hodari D., 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (" Mendenhall establishes that the test for existence of a 'show of authority' [for seizure purposes] is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but *1082 whether the officer's words and actions would have conveyed that to a reasonable person.").
Requiring officers to determine how an individual's race affects her reaction to a police request would seriously complicate Fourth Amendment seizure law. As the government notes, there is no easily discernable principle to guide consideration of race in the reasonable person analysis. Aplt. Br. at 16-17. There is no uniform life experience for persons of color, and there are surely divergent attitudes toward law enforcement officers among members of the population. Thus, there is no uniform way to apply a reasonable person test that adequately accounts for racial differences consistent with an objective standard for Fourth Amendment seizures. This distinguishes race from the Supreme Court's consideration of age in the reasonable person analysis in J.D.B. v. North Carolina, 564 U.S. 261, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011). In J.D.B., the Court noted that age is distinct from subjective considerations because it is readily discernible by police and any considerations apply broadly to children as a class. Id. at 272, 131 S.Ct. 2394. In addition, the considerations applicable to children are "self-evident to anyone who was a child once himself, including any police officer or judge," eliminating the necessity of conjecture about the effect age has on one's perception of freedom to leave. Id. In contrast, consideration of race undermines one of the chief benefits of an objective test for search and seizure law, namely, the ability it gives law enforcement to know ex ante what conduct implicates the Fourth Amendment. See, e.g., id. at 271, 131 S.Ct. 2394 ("The benefit of the objective custody analysis is that it is 'designed to give clear guidance to the police.' " (quoting Yarborough v. Alvarado, 541 U.S. 652, 668, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ) ). Furthermore, as the government correctly notes, a seizure analysis that differentiates on the basis of race raises serious equal protection concerns if it could result in different treatment for those who are otherwise similarly situated. Aplt. Br. at 30-31. In short, the categorical consideration of race in the reasonable person analysis is error, and we reject Ms. Easley's argument to the contrary.
Finally, Ms. Easley contends that Agent Perry's failure to inform her of her right to refuse to cooperate, when considered with the other circumstances of their encounter, contributed to the creation of a coercive environment. But it has never been a requirement of the Fourth Amendment that law enforcement officers inform an individual of her constitutional right to refuse to consent to a search or her freedom to leave before they ask her to cooperate. See, e.g., United States v. Ledesma, 447 F.3d 1307, 1315 (10th Cir.2006) ("The Supreme Court has admonished ... that an officer's failure to inform the defendant that she is free to leave, standing alone, does not make an encounter nonconsensual."). The same is true here: Agent Perry was under no obligation to inform Ms. Easley that she was free not to cooperate with him or to answer his questions. And in the absence of any other factor that would lead this court to conclude that the reasonable person would not have felt free to rebuff him, the fact that Agent Perry did not inform Ms. Easley that she was free to terminate their encounter cannot convert their interaction into an illegal seizure.
We conclude, then, that the district court erred when it determined that Ms. Easley was illegally seized in violation of the Fourth Amendment. A reasonable person in her position would have felt free to terminate her encounter with the police and refuse to cooperate. We turn next to *1083 Ms. Easley's abandonment of the Denise Moore suitcase and its contents.
B. Abandonment
The Fourth Amendment is not implicated when police search property that has been abandoned. See United States v. Juszczyk, 844 F.3d 1213, 1213 (10th Cir.2017). Abandonment occurs if either (1) the owner subjectively intended to relinquish ownership of the property or (2) the owner lacks an objectively reasonable expectation of privacy in the property. See id. at 1214 ; United States v. Garzon, 119 F.3d 1446, 1449 (10th Cir.1997). The owner's abandonment must be voluntary, and abandonment cannot be voluntary when it results from a violation of the Fourth Amendment. United States v. Ojeda-Ramos, 455 F.3d 1178, 1187 (10th Cir.2006).
Here, the district court found that Ms. Easley's abandonment of the Denise Moore suitcase was involuntary because she had already been illegally seized by Agent Perry. Given our conclusion that Ms. Easley was not seized, her abandonment of the Denise Moore suitcase could not have been the product of an illegal seizure.
The question, then, is whether a reasonable officer in Agent Perry's position would have believed that Ms. Easley had relinquished any property interests she possessed in the Denise Moore suitcase based on her voluntary words and actions. See, e.g., United States v. Pitts, 322 F.3d 449, 456 (7th Cir.2003). We hold that he would.
Here, it is clear from Ms. Easley's words and actions that she relinquished any expectation of privacy in the Denise Moore suitcase. In response to Agent Perry's questions she responded that she did not own the bag, did not know who the bag belonged to, did not have any interest in what happened to the bag, and even claimed that she had never seen the bag before. 2 Aplt. App. 329-30. It is also clear from the record that these statements were voluntary given the surrounding circumstances; as we have already said, her statements were not the product of an illegal arrest on Agent Perry's part. Additionally, Agent Perry used deferential language throughout his interaction with Ms. Easley, including when he requested that Ms. Easley step off the bus. See, e.g., id. at 326 ("Excuse me, ma'am. Can I speak to you outside for one second, please?"). And he used similarly deferential and courteous language while asking her about her luggage, and his tone of voice was cordial and nonthreatening throughout. See id. at 327-28; see also 3 Aplt. App. 19:00-20:35 (first audio recording), 0:08-2:48 (second audio recording). Furthermore, the mere fact that Ms. Easley was the subject of police questioning and investigation at the time of abandonment-and may have felt pressure while under police questioning to relinquish the bag-does not of itself render that abandonment involuntary. See United States v. Flynn, 309 F.3d 736, 738 (10th Cir.2002). Ms. Easley's responses to Agent Perry's questions were the product of her own free will and would have led a reasonable law enforcement officer to believe she had relinquished any expectation of privacy in the suitcase. We conclude the agents' search of the Denise Moore suitcase was a valid search of abandoned property; suppression of the evidence the suitcase contained was error.
C. Confession
Because we have found there was no preceding constitutional violation to taint Ms. Easley's confession, suppression of her inculpatory statements was error. The parties did not brief or argue any other ground to support the district court's decision on appeal, so we remand to the distr *1084 ict court to resolve the admissibility of Ms. Easley's confession in the first instance.
Conclusion
REVERSED and REMANDED for further proceedings consistent with this opinion.

The government argues that it could find no support in the record for the district court's statements that Ms. Easley was the only black passenger on the bus. Aplt. Br. at 9 n.6; see Easley, 293 F.Supp.3d at 1307. There is no need for us to address any contention that the district court's finding was clearly erroneous because, for the reasons explained below, the racial composition of the bus's passengers is not relevant to the Fourth Amendment seizure analysis.

It is inappropriate to consider the prior cooperation of other bus passengers because doing so weakens the administrability of seizure law, undermining the rule's ability to steer law enforcement conduct. Accepting an argument that consent or cooperation by third parties can create a coercive environment raises difficult line-drawing questions: At what point would the consent or cooperation offered by previous individuals have sufficiently compounded to produce a coercive environment? There is no clear principle to guide officers in determining when a sufficient number of people have cooperated to render an environment coercive. And if that is the case, then what guidance would such a rule give to law enforcement, whose behavior the exclusionary rule is meant to police? See Davis v. United States, 564 U.S. 229, 236-37, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011). We reject any such domino theory of the Fourth Amendment.

In Little, we noted that the particular personal traits or characteristics of the defendant are irrelevant to the Fourth Amendment's reasonable person test "other than to the extent that they may have been known to the officer and influenced his conduct ." Little, 18 F.3d at 1505 (emphasis added) (quoting United States v. Bloom, 975 F.2d 1447, 1455 n.9 (10th Cir.1992) ). As Little suggests, the Tenth Circuit has only found personal characteristics to be relevant when those personal characteristics affected the conduct of law enforcement officers -for example, making apparent an officer's racial bias. When determining whether an individual has been seized, the court has never discussed the effect of an individual's own race on her reaction to law enforcement behavior.