NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12808

COMMONWEALTH  vs.  TYKORIE EVELYN.


Suffolk.     January 7, 2020.  -  September 17, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Cypher, & Kafker,
JJ.[1]


Threshold Police Inquiry.  Constitutional Law, Search and
    seizure, Reasonable suspicion.  Search and Seizure,
    Threshold police inquiry, Reasonable suspicion.  Practice,
    Criminal, Motion to suppress.



Indictments found and returned in the Superior Court
Department on March 20, 2017.

A pretrial motion to suppress evidence was heard by Michael
D. Ricciuti, J.

An application for leave to prosecute an interlocutory
appeal was allowed by Lenk, J., in the Supreme Judicial Court
for the county of Suffolk, and the appeal was reported by her to
the Appeals Court.  The Supreme Judicial Court on its own
initiative transferred the case from the Appeals Court.


K. Hayne Barnwell (Janice Bassil also present) for the
defendant.

_____

[1] Chief Justice Gants participated in the deliberation on
this case prior to his death.

Cailin M. Campbell, Assistant District Attorney (David S. Bradley, Assistant District Attorney, also present) for the Commonwealth.

The following submitted briefs for amici curiae:

Katherine E. Burdick for Juvenile Law Center & others.

Jin Hee Lee & Ashok Chandran, of New York, & Katharine Naples-Mitchell for Charles Hamilton Houston Institute for Race and Justice & another.

Anthony Mirenda, Neil Austin, Rachel C. Hutchinson, & Ned Melanson for Massachusetts Association of Criminal Defense Lawyers & others.

GAZIANO, J. Thirteen minutes after a shooting, and one half-mile away, two police officers encountered the defendant walking on the sidewalk. They drove slowly alongside him for approximately one hundred yards, while he repeatedly rebuffed their attempts to speak with him. When one of the officers started to get out of the cruiser, the defendant sprinted away. The officers gave chase, stopped the defendant, and arrested him. They found a firearm lying on the ground along the route on which he had run. The defendant subsequently was indicted on charges including murder in the first degree.

In a motion to suppress, the defendant argued that the officers stopped him without reasonable suspicion at the moment that one of the officers opened the door of the cruiser, and that all of the evidence subsequently obtained as a result of the stop must be suppressed. The defendant, who is Black, was seventeen years at the time of the stop. He argued, as he does before this court, that his race and age should form part of the

totality of the circumstances relevant to a determination of when he was seized. The defendant contends that juveniles are more susceptible to police coercion, and therefore will be seized in circumstances where adults would not. He also maintains that, based on the history and present reality of policing and race, police communications directed at African-Americans will have greater coercive power than those directed at people of other races.

After his motion to suppress was denied, the defendant sought leave in the county court to pursue an interlocutory appeal. His petition was allowed, and his appeal was ordered to proceed in the Appeals Court; we then transferred the matter to this court on our own motion.

We conclude that the defendant indeed was seized when, after having trailed him for one hundred yards in a police cruiser and repeatedly having tried to converse with him, the officer in the front passenger's seat opened the door of the cruiser. On the record here, however, the judge did not abuse his discretion in relying on the officers' testimony about their experience with firearms, and in concluding that, in the circumstances, they had a reasonable, articulable suspicion of criminal activity. Accordingly, we affirm the denial of the motion to suppress. Going forward, however, the age of a juvenile suspect, if known to the officer or if objectively

apparent to a reasonable officer, will be part of the totality of the circumstances relevant to whether the juvenile was seized under art. 14 of the Massachusetts Declaration of Rights.

With respect to the defendant's arguments on race, we have examined the continued relevance of our reasoning in Commonwealth v. Warren, 475 Mass. 530, 540 (2016), on the question of reasonable suspicion. In that case, we concluded that an innocent African-American man in an urban area might flee from police for fear of racial profiling, and therefore the weight of the inference properly given to flight should be less when the individual is African-American. See id. We conclude that this reasoning remains pertinent to the reasonable suspicion analysis, and should be extended to other types of nervous or evasive behavior in addition to flight.[2]

Background. We summarize the facts as found by the motion judge. See Commonwealth v. Phifer, 463 Mass. 790, 791 (2012).

Both of the arresting officers testified at the hearing on the motion to suppress. At the time of the hearing, Officer

---

[2] We acknowledge the amicus briefs of the Juvenile Law Center, Professor Kristin Henning, and the youth advocacy division of the Committee for Public Counsel Services; the Charles Hamilton Houston Institute for Race and Justice at Harvard Law School and the NAACP Legal Defense and Educational Fund, Inc.; and the Massachusetts Association of Criminal Defense Lawyers, the American Civil Liberties Union of Massachusetts, the New England Innocence Project, and the Public Defender and Private Counsel Divisions of the Committee for Public Counsel Services.

Joseph Abasciano had been a Boston police officer for eleven years, with gaps in service of several years due to military deployment and an injury.  He had been trained regarding the use of firearms and the identification of concealed firearms by the Boston police department and the United States Marine Corps. Prior to the night of the shooting, he had participated in multiple arrests of suspects in possession of firearms.[3]

At the time of the hearing, Officer Brian Garney had been an officer for three years.  He had been working patrol for about several months before the night of the shooting.  At that point, he had never made an arrest, but had assisted with a few. He had been trained to identify concealed firearms, in part through a presentation at the police academy entitled "Characteristic of Armed Gunman Overview."

On the evening of January 9, 2017, Abasciano and Garney were on patrol in their marked cruiser; Abasciano was driving. At about 7:27 P.M., they received a notification from "ShotSpotter," a system that identifies firearm discharges by

---

[3] The defendant argues that the judge's finding concerning the number of arrests was clearly erroneous.  He notes that, in response to a court order directing the Boston police department to produce all firearm-related incident reports involving Officer Joseph Abasciano from 2007 to 2011, the department produced only two reports.  Nonetheless, the judge's finding that Abasciano had made at least ten arrests was supported by Abasciano's testimony, and therefore was not clearly erroneous. See Commonwealth v. Tremblay, 480 Mass. 645, 655 n.7 (2018).

sound and directs officers to the general location of the shots. The notification indicated that shots had been fired near Dearborn Street in the Roxbury section of Boston.

The officers also received a radio report that a person had been shot and was severely injured, and that three people had run from the area. No descriptions of the suspects were given. Unbeknownst to the officers, the victim died shortly thereafter. The report indicated that the men had run towards Adams Street, heading southeast on Eustis Street. The officers, however, mistakenly believed that the report stated that the suspects had run away from Adams Street. Accordingly, the officers headed to the northwest of the location of the shooting. Abasciano was aware that there had been a rivalry between gangs based near that location, and that one gang was based in the area to which they were driving. Garney testified that they drove in that direction because of ongoing, gang-related violence in the area.

The evening was cold, and the officers did not see any pedestrians. When they reached the corner of Melnea Cass Boulevard and Shawmut Avenue, thirteen minutes after the shooting, they saw the defendant walking on Dewitt Drive, one street away. He was approximately one-half mile from the reported location of the shooting.

The officers drove up to the defendant and saw that he appeared to be holding an object in his right jacket pocket that

was consistent with the size of a firearm. The officers could see immediately that the defendant was African-American and was younger than twenty-one years old. Abasciano called out, "Hey, man, can I holler at you?" The defendant increased his pace and responded, "For what?" Abasciano said that something had happened in the area, and he wanted to know if the defendant had seen or heard anything. The officers could not hear the defendant's response, which Abasciano described as a mumble. They drove slowly alongside the defendant for approximately one hundred yards as he walked on the sidewalk. Throughout the exchange, the defendant did not make eye contact with the officers. At one point, he turned the right side of his body away from them, thereby blocking them from being able to see his right jacket pocket. To Abasciano the movement appeared unnatural. The defendant began looking around in various directions.

Garney got out of the cruiser, and the defendant began to run away. The officers gave chase; Garney was on foot and Abasciano remained in the cruiser. During the pursuit, the officers noticed the defendant running awkwardly with his hands in his pockets. Abasciano got out of the cruiser and saw the defendant starting to take an object out of his right pocket. Abasciano drew his weapon and ordered the defendant to stop, and the defendant stopped shortly thereafter. The officers

recovered a firearm on the sidewalk where the defendant had been running.

Dr. Dawn Sweet, a professor at a large university, testified for the defense. Among other testimony, she described a recent study she had conducted, which was introduced in evidence, on visual detection of concealed weapons. See Sweet, Meissner, & Atkinson, Assessing Law Enforcement Performance in Behavior-Based Threat Detection Tasks Involving a Concealed Weapon or Device, 41 Law and Human Behavior 411 (2017) (threat study). In the threat study, participants, some of whom were carrying concealed firearms, were videotaped as they walked into a secure facility. Fifty-one police officers and fifty-six college students watched the recordings and attempted to identify which subjects were carrying firearms. Ultimately, the police officers performed no better than did the college students. Officers with more years of experience were more likely than those with fewer to identify someone as carrying a concealed firearm where no weapon was present.

Sweet also testified that studies have shown that police officers are more likely to view African-Americans as threats, something she described as implicit bias. She explained that police interactions could be affected by stereotype threat, a phenomenon in which a member of a particular group exhibits certain behaviors out of concern that he or she will be

stereotyped negatively based on membership in that group. Sweet explained that stereotype threat could cause an African-American teenager to experience anxiety. In response to a hypothetical question based on the facts known to the officers before they began the chase, Sweet said that there was no scientific literature that would support the conclusion that the defendant had been carrying a firearm. The defendant also introduced an additional six studies regarding implicit racial bias and stereotype threat.

The judge credited the officers' testimony, and discounted Sweet's testimony and the results reported in the six other studies. The judge concluded that the officers seized the defendant near the end of the chase, when Abasciano pointed his weapon and ordered the defendant to stop; the judge determined that the stop had been supported by reasonable suspicion.

Discussion. When reviewing a ruling on a motion to suppress, we accept the motion judge's findings of fact absent clear error. See Commonwealth v. Franklin, 456 Mass. 818, 820 (2010). In addition, the motion judge, who heard and saw the witnesses, determines the weight and credibility of the evidence. See Commonwealth v. Gomes, 453 Mass. 506, 509 (2009). With respect to legal questions, however, we "conduct an independent review of [the] ultimate findings and conclusions of

law."  Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015), quoting Commonwealth v. Ramos, 470 Mass. 740, 742 (2015).

1.  Seizure.  The defendant argues that he was seized when the officer opened the door of the cruiser, that his age and race are two of the objective circumstances that should have been considered in the seizure analysis, and that the judge erred by not taking them into account.

Under the Fourth Amendment to the United States Constitution, a person is seized "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." Michigan v. Chesternut, 486 U.S. 567, 573 (1988), quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.).  See California v. Hodari D., 499 U.S. 621, 626 (1991) (seizure occurs only where officer applies physical force or suspect submits to show of authority).  Under art. 14, a seizure occurs when an officer, "through words or conduct, objectively communicate[s] that the officer would use his or her police power to coerce [an individual] to stay."  Commonwealth v. Matta, 483 Mass. 357, 362 (2019), citing Commonwealth v. Barros, 435 Mass. 171, 175-176 (2001).  We interpret the officer's actions based on the totality of the circumstances surrounding the encounter.  See Matta, supra.

To decide whether there was error in the judge's decision to deny the motion to suppress, we first must determine the moment of seizure. See Commonwealth v. Narcisse, 457 Mass. 1, 5 (2010). "[Article] 14 provides more substantive protection than does the Fourth Amendment in defining the moment" of seizure. Commonwealth v. Lyles, 453 Mass. 811, 812 n.1 (2009), citing Commonwealth v. Stoute, 422 Mass. 782, 786-789 (1996). Accordingly, we analyze the seizure under "the more stringent standards of art. 14 with the understanding that, if these standards are satisfied, then so too are those of the Fourth Amendment." See Lyles, supra, citing Commonwealth v. Williams, 422 Mass. 111, 115 n.9 (1996).

a. Age. In J.D.B. v. North Carolina, 564 U.S. 261, 271-276 (2011), the United States Supreme Court addressed whether age is relevant to the custody inquiry under Miranda v. Arizona, 384 U.S. 436, 444 (1966) (requiring warnings prior to custodial interrogation). Custody exists when "a reasonable person in the suspect's shoes would experience the environment in which the interrogation took place as coercive." Commonwealth v. Larkin, 429 Mass. 426, 432 (1999). See Commonwealth v. Sneed, 440 Mass. 216, 220 (2003) (setting forth certain "indicia of custody"). The Court in J.D.B., supra, was forced to reconcile two potentially conflicting considerations. On the one hand, the Court recognized the evident fact that "[i]n some circumstances,

a child's age would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave" (quotations and citation omitted).  Id. at 271-272.  But, on the other hand, the Court was wary of undermining the objectivity of the inquiry, which "avoids burdening police with the task of anticipating the idiosyncrasies of every individual suspect . . . ."  See id. at 271, citing Berkemer v. McCarty, 468 U.S. 420, 430-431 (1984).

Ultimately, the Court determined that the effects of youth on cognition are not entirely individualistic.  See J.D.B., 564 U.S. at 272.  See also Miller v. Alabama, 567 U.S. 460, 472-473 (2012); Commonwealth v. A Juvenile, 389 Mass. 128, 131-132 (1983).  Rather, age is "a fact that 'generates commonsense conclusions about behavior and perception.'"  J.D.B., supra, quoting Yarborough v. Alvarado, 541 U.S. 652, 674 (2004) (Breyer, J., dissenting).  Because those conclusions are widely and easily understood, "so long as the child's age was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the custody analysis is consistent with the objective nature of that test."  See J.D.B., supra at 277.

The defendant argues that the Court's reasoning in J.D.B., 564 U.S. at 271-272, applies equally to the seizure analysis.  See 4 W.R. LaFave, Search and Seizure § 9.4(a) (5th ed. 2012 &

Supp. 2020) (predicting application of reasoning in J.D.B., supra, to seizure). See also United States v. Ricardo D., 912 F.2d 337, 342 & n.2 (9th Cir. 1990), citing Dunaway v. New York, 442 U.S. 200, 215 & n.17 (1979) ("Over a decade ago, the Supreme Court suggested that a suspect's age may be considered in determining whether a seizure constitutes an arrest"); In re J.G., 228 Cal. App. 4th 402, 410-411 (2014) ("extending the holding [of J.D.B., supra,] to search and seizure cases would not be much of a stretch").

The custody and seizure inquiries, however, are not identical. First, the custody inquiry under Miranda primarily protects the right against self-incrimination and the right to counsel under the Fifth and Sixth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. See Commonwealth v. Martin, 444 Mass. 213, 214-215 (2005), citing Commonwealth v. Snyder, 413 Mass. 521, 531 (1992). The seizure inquiry, by contrast, protects the right to be free from unreasonable seizures under the Fourth Amendment and art. 14. See Gomes, 453 Mass. at 509-510. To safeguard these distinct rights, the inquiries consider somewhat different questions. Compare Commonwealth v. Groome, 435 Mass. 201, 211 (2001) (custody is established "if the defendant reasonably believed that he [or she] was not free to leave" [citation omitted]) with Matta, 483 Mass. at 362 (seizure occurs when

officer "objectively communicate[s] that the officer would use . . . police power to coerce [a suspect] to stay").

Despite their differences, the two inquiries also are much the same. At their cores, both inquiries attempt to ascertain whether, considering the totality of the circumstances, an individual has been compelled to interact with the police. See Matta, 483 Mass. at 362; Groome, 435 Mass. at 211. Under both doctrines, the scope of review is limited to the objective circumstances of the encounter. See Matta, supra (test to determine whether someone is seized "is whether an officer has, through words or conduct, objectively communicated that the officer would use his or her police power to coerce th[e] person to stay"); Commonwealth v. Morse, 427 Mass. 117, 124 (1998), quoting Stansbury v. California, 511 U.S. 318, 323 (1994) ("determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned").

In each context, the naiveté, immaturity, and vulnerability of a child will imbue the objective communications of a police officer with greater coercive power. See J.D.B., 564 U.S. at 271-272. Pretending otherwise would diminish a juvenile's right to be free from unwanted police interactions. See Barros, 435 Mass. at 178. The consideration of age will not undermine

the objective nature of the inquiry, because many of the effects of youth "apply broadly to children as a class" and "are self-evident to anyone who was [once] a child . . . ." J.D.B., 564 U.S. at 272. We therefore conclude that a child's age, when known to the officer or objectively apparent to a reasonable officer, is relevant to the question of seizure under art. 14. The question will be whether the officer objectively communicated to a person of the juvenile's apparent age that the officer would use his or her police power to coerce the juvenile to stay.[4]

Of course, the exact contours of this inquiry are not yet known. As in any part of our art. 14 jurisprudence, a new rule

---

[4] Numerous courts in other jurisdictions similarly have held that the age of a juvenile suspect should be considered in the objective seizure determination. See, e.g., Halley v. Huckaby, 902 F.3d 1136, 1145 (10th Cir. 2018), cert. denied, 139 S. Ct. 1347 (2019); In re Appeal in Maricopa County, 186 Ariz. 213, 217 (1996); Hunt ex rel. DeSombre v. State, Dep't of Safety & Homeland Sec., Div. of Del. State Police, 69 A.3d 360, 366 (Del. 2013); J.N. v. State, 778 So. 2d 440, 442 (Fla. Dist. Ct. App. 2001); People v. Lopez, 229 Ill. 2d 322, 353 (2008); In re I.R.T., 184 N.C. App. 579, 584 (2007). Other courts have concluded that the age of a juvenile may be relevant to the seizure inquiry. See, e.g., Doe v. Heck, 327 F.3d 492, 510 (7th Cir. 2003), as amended on denial of reh'g (May 15, 2003); United States v. Ricardo D., 912 F.2d 337, 342 & n.2 (9th Cir. 1990), citing Dunaway v. New York, 442 U.S. 200, 215 & n.17 (1979); Phillips v. County of Orange, 894 F. Supp. 2d 345, 363 (S.D.N.Y. 2012). Other courts have noted that characteristics such as youth should be included in the seizure analysis only where they would be known or apparent to the officer, but have not decided whether youth or any other of these characteristics should be included in the seizure analysis. See, e.g., In re J.M., 619 A.2d 497, 501 n.5 (D.C. App. 1992).

inevitably invites questions of application that cannot be answered in the first instance. See Commonwealth v. Eddington, 459 Mass. 102, 109 n.12 (2011) ("touchstone of reasonableness . . . necessitates a case-by-case analysis").

Here, there is insufficient evidence that the officers knew or should have known, prior to his arrest, that the defendant was below the age of eighteen. The defendant was seventeen years old and six feet tall. He was wearing a hat and jacket, and the area was dark. The police report stated that the officers did not ask the defendant if he had a license to carry a firearm because they could tell after approaching him that he was under twenty-one years of age. But that alone is insufficient to trigger an inference that the officers should have known that he was under the age of eighteen. Therefore, we do not consider his age in our analysis.

b. Race. The defendant also argues that the fact that he is African-American should inform our seizure analysis. In Warren, 475 Mass. at 539, we discussed a report from the Boston police department indicating that African-American men were targeted disproportionately for stops, frisks, and searches in the years 2007 to 2010.[5] The Boston police department

---

[5] See Commonwealth v. Warren, 475 Mass. at 539, discussing Boston Police Department, Boston Police Commissioner Announces Field Interrogation and Observation Study Results,

subsequently has released two similar reports.[6]  Although the total number of field interrogation and observation (FIO) encounters has fallen, African-Americans continue to be targeted disproportionately in such encounters.[7]

In Warren, 475 Mass. at 539, we examined FIO data in the context of reasonable suspicion, as we do in this case, infra. The defendant argues that these reports also are relevant to the seizure analysis.  He contends that the documented pattern of

_____

http://bpdnews.com/news/2014/10/8/boston-police-commissioner-announces-field-interrogation-and-observation-fio-study-results [https://perma.cc/H9RJ-RHNB].

[6] One report analyzed field interrogation and observation (FIO) encounters from 2011 to April 2015.  See Boston Police Department, Boston Police Department Releases Latest Field Interrogation Observation Data (May 23, 2015), https://bpdnews.com/news/2017/5/23/boston-police-department-releases-latest-field-interrogation-observation-data [https://perma.cc/6Z79-VRKM] (2017 Report).  The other report analyzed information from June 2015 through June 2016.  See Boston Police Department, Commissioner Evans Continues Efforts to Increase Transparency and Accountability of Policing Activities to the Public (Jan. 8, 2016), https://bpdnews.com /news/2016/1/7/commissioner-evans-continues-efforts-to-increase-transparency-and-accountability-of-policing-activities-to-the-public [https://perma.cc/4RDS-EWTH] (2016 Report).

[7] In the earlier data, 63.3 percent of FIO subjects were African-American.  See Warren, 475 Mass. at 539 n.15.  From 2011 to April 2015, 58.5 per cent were African-American.  See 2016 Report.  From June 2015 through 2016, 63.6 per cent were African-American.  See 2017 Report.  In the most recent report, the Boston police department separated race and ethnicity, which previously had been combined in the same category, into different categories. See 2017 Report.  In order to make appropriate comparisons with the report cited in Warren, supra, we reference the statistics given for the earlier classification scheme that combined race and ethnicity in one category.

disproportionate FIO stops of African-Americans by Boston police injects an element of coercion into police encounters with African-American individuals that is not present in other police interactions.

We agree that the troubling past and present of policing and race are likely to inform how African-Americans and members of other racial minorities interpret police encounters.  See generally Commonwealth v. Buckley, 478 Mass. 861, 871 (2018) (noting "enormity . . . of the problem of racial profiling"); Commonwealth v. Lora, 451 Mass. 425, 444-445 (2008), quoting Commonwealth v. Feyenord, 445 Mass. 72, 88 (2005), cert. denied, 546 U.S. 1187 (2006) (Greaney, J., concurring) (discussing "humiliating, painful, and unlawful" nature of some police encounters with African-American and Hispanic individuals); Commonwealth v. Gonsalves, 429 Mass. 658, 670 (1999) (Ireland, J., concurring) (recognizing "widespread public concerns" about racial profiling by police).  African-Americans, particularly males, may believe that they have been seized in situations where other members of society would not.  See Maclin, "Black and Blue Encounters" -- Some Preliminary Thoughts About Fourth Amendment Seizures:  Should Race Matter?, 26 Val. U. L. Rev. 243, 255 (1991) ("Black males learn at an early age that confrontations with the police should be avoided; [B]lack

teenagers are advised never to challenge a police officer, even when the officer is wrong").

Notwithstanding these serious concerns, in determining whether an individual had been seized, the analysis "must arise from the actions of the police officer[,]" and not from the individual's state of mind.  See Matta, 483 Mass. at 363.  See also Chesternut, 486 U.S. at 574 ("'reasonable person' standard  . . . ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual").  We maintain an objective standard so that officers can "determine in advance whether the conduct contemplated will implicate the Fourth Amendment" or art. 14 (citation omitted).  See id.

Few courts have yet to reach the issue of race in the seizure analysis.  Among the few to have done so, the United States Courts of Appeals for the Ninth and Tenth Circuits have come to different conclusions about whether to include race in that analysis.

The United States Court of Appeals for the Ninth Circuit has included race in the seizure analysis.  In United States v. Washington, 490 F.3d 765, 768-769 (9th Cir. 2007), the court concluded that recent well-publicized incidents in which police officers shot African-American citizens passed the requisite

threshold of objectivity and therefore were relevant to whether an African-American man had been seized.

Courts in some other jurisdictions have stated that race is relevant to seizure, but have not undertaken a race-based analysis; in the circumstances of the cases confronting them, they have held that seizures occurred without considering race. See United States v. Smith, 794 F.3d 681, 687-688 (7th Cir. 2015) (noting "relevance of race in everyday police encounters," as well as "empirical data demonstrating the existence of racial profiling, police brutality, and other racial disparities in the criminal justice system"); State v. Jones, N.H Supreme Court, No. 2019-0057 at 6-7 (January 10, 2020) ("race is an appropriate circumstance to consider in . . . seizure analysis" [citation omitted]).

Conversely, the United States Court of Appeals for the Tenth Circuit has determined that experiences with, and attitudes towards, police are not universal across racial groups, and therefore are not objective. See United States v. Easley, 911 F.3d 1074, 1081-1082 (10th Cir. 2018), cert. denied, 139 S. Ct. 1644 (2019) (declining to consider race in seizure analysis); United States v. Little, 18 F.3d 1499, 1505 & n.7 (10th Cir. 1994) (rejecting race as "general across-the-board categorization[]" in seizure analysis). As the Tenth Circuit explained in Easley, supra at 1082,

"Requiring officers to determine how an individual's race affects her reaction to a police request would seriously complicate Fourth Amendment seizure law.  As the government notes, there is no easily discernable principle to guide consideration of race in the reasonable person analysis. . . .  There is no uniform life experience for persons of color, and there are surely divergent attitudes toward law enforcement officers among members of the population.  Thus, there is no uniform way to apply a reasonable person test that adequately accounts for racial differences consistent with an objective standard for Fourth Amendment seizures.  This distinguishes race from the Supreme Court's consideration of age in the reasonable person analysis in J.D.B. v. North Carolina, 564 U.S. 261 [(2011)]."

As discussed infra, we agree with the defendant in this case, based on factors other than race, that he was seized when Garney opened the cruiser door.  We therefore attempt to focus attention on the issue of race, while not establishing bright-line rules that potentially could do more harm than good.  Accordingly, we do not decide here whether the race of a defendant properly informs the seizure inquiry.  See Commonwealth v. AdonSoto, 475 Mass. 497, 506 (2016), quoting Commonwealth v. Raposo, 453 Mass. 739, 743 (2009) ("We do not decide constitutional questions unless they must necessarily be reached"); Commonwealth v. Kulesa, 455 Mass. 447, 457 n.9 (2009), quoting Commonwealth v. Paasche, 391 Mass. 18, 21 (1984) (same).

c.  Application.  An officer generally does not objectively communicate that he or she would coerce an individual to stay merely by asking questions.  See Franklin, 456 Mass. at 820.

Thus, the officers here did not seize the defendant when they asked to talk with him, or when they explained that they wanted to know if he had seen or heard anything. See Matta, 483 Mass. at 364 (no seizure where officer said "Hey, come here for a second"); Barros, 435 Mass. at 172 ("Hey you . . . I want to speak with you" was not seizure); Commonwealth v. Rock, 429 Mass. 609, 611 (1999) (no seizure where officer stepped out of vehicle, identified himself, and asked, "[C]an I talk to you for a second?"); Stoute, 422 Mass. at 789 (request that suspect "hold up a minute" was not seizure).

The defendant's reaction to the officers, however, altered the nature of the encounter. In response to the request to talk, the defendant said, "For what?" He walked quickly away, and increased his speed as the interaction lengthened. During his second, mumbled response, he began to look in various other directions.

These actions communicated a desire to terminate the interaction, but the officers continued to follow their reluctant interlocutor for one hundred yards. Their persistence came to a head when Garney opened the cruiser door, making clear that the officers were going to converse with the defendant notwithstanding his evident wishes to the contrary. We agree with the defendant that, at that moment, he was seized. See Barros, 435 Mass. at 175-176 (seizure occurred where officer

"le[ft] his cruiser and walk[ed] up to [defendant] after being rebuffed" and said, "Hey you. I wanna talk to you. Come here"); Commonwealth v. Evans, 87 Mass. App. Ct. 687, 691-692 (2015) (although initial questioning from cruiser was not seizure, officer effected seizure by getting out of vehicle and continuing to question defendant).

2. Reasonable suspicion. For an investigatory stop to have been constitutional under art. 14, police officers must have had "reasonable suspicion, based on specific and articulable facts, that the defendant had committed, was committing, or was about to commit a crime." See Commonwealth v. Depina, 456 Mass. 238, 242 (2010). See also Terry v. Ohio, 392 U.S. 1, 21 (1968).

The defendant maintains that the officers did not have reasonable suspicion to justify the stop, and that the judge erred in relying upon police testimony regarding the characteristics of an individual carrying a concealed firearm. The Commonwealth argues that even if we place the moment of seizure at the beginning of the chase, as we do, the officers at that point had reasonable, articulable suspicion that the defendant had committed a crime. The Commonwealth points to the following factors to support this conclusion: the proximity of the stop to a shooting, evidence that the defendant was carrying a firearm, and the defendant's nervous and evasive behavior.

The judge also found the "high crime" nature of the area to be probative.  We agree that there was reasonable suspicion, but for somewhat different reasons, primarily based on the proximity to a recent shooting and the indications that the defendant was carrying a firearm.

a.  Proximity to a shooting.  We consistently have held that geographic and temporal proximity to a recent crime weigh towards reasonable suspicion in the over-all analysis.  See Depina, 456 Mass. at 246; Commonwealth v. Riggins, 366 Mass. 81, 87 (1974) (reasonable suspicion was bolstered by fact that time and location of encounter "was consistent with the time necessary to travel there from the scene of the robbery").  Here, the officers encountered the defendant thirteen minutes after the shooting, one-half mile distant from it.  It was a cold night, and the officers had not seen any other pedestrians on the nearby streets.  The defendant was walking away from the location of the shooting, with his hands in the pockets of his jacket.  The time and location was consistent with the theory that he had been present at the shooting and had walked to Dewitt Drive in the intervening minutes.  These facts track closely with those in Depina, supra, where the defendant was found three blocks from the shooting, ten minutes after it had occurred.  Therefore, his proximity to the crime supported reasonable suspicion.  Contrast Warren, 475 Mass. at 536 (no

reasonable suspicion where defendant was stopped twenty-five minutes after crime, one mile away).

Additionally, the crime being investigated here was a shooting that had left the victim in critical condition. These circumstances indicated a potential ongoing risk to public safety, and therefore weighed in favor of reasonable suspicion. See Depina, 456 Mass. at 247 ("gravity of the crime" supported reasonable suspicion); Commonwealth v. Hilaire, 92 Mass. App. Ct. 784, 791 (2018), quoting Commonwealth v. Meneus, 476 Mass. 231, 239 (2017) (reasonable suspicion was supported by "fact that the crime under investigation was a shooting, with implications for public safety"); Commonwealth v. Doocey, 56 Mass. App. Ct. 550, 557 (2002) ("in circumstances where [a] gun presents an imminent threat because of shots just fired, or likely to be fired, . . . there is an edge added to the [reasonable suspicion] calculus"). But see Meneus, supra ("we have not gone so far as to carve out a public safety exception").

In sum, although the defendant's proximity to a recent shooting was not sufficient alone to establish reasonable suspicion, it provided significant support.

b. Evidence of a firearm. The officers testified to several observations that indicated that the defendant might have been carrying a firearm. Before discussing the probative

value of that testimony, we address the defendant's evidentiary challenges.

After filing his motion to suppress, the defendant sought a Daubert-Lanigan hearing to exclude from the hearing on the motion all testimony concerning the officers' training and experience in recognizing individuals who are carrying concealed firearms. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); Commonwealth v. Lanigan, 419 Mass. 15 (1994). In support of his motion, the defendant offered testimony by Sweet regarding the scientific literature, and the absence thereof, on the detection of concealed firearms. The Commonwealth, in turn, moved to exclude Sweet's testimony as not meeting the standards set forth in Daubert and Lanigan. The judge denied both motions, and allowed both the officers' testimony and Sweet's testimony to be introduced. Ultimately, the judge's decision relied significantly on testimony by the officers, and largely discredited Sweet's opinion testimony. We review the judge's decisions on the introduction or exclusion of evidence for abuse of discretion. See Canavan's Case, 432 Mass. 304, 311 (2000). See also United States v. Bunnell, 280 F.3d 46, 49 (1st Cir. 2002) (reviewing admission of testimony at suppression hearing for abuse of discretion).

The defendant argues that the officers' testimony based on their training and experience in identifying concealed weapons was inadmissible expert testimony under Daubert and Lanigan.

"[T]he rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence." United States v. Matlock, 415 U.S. 164, 172-173 (1974). See Mass. G. Evid. § 1101(d) (2020). When deciding a question of admissibility at a hearing on a motion to suppress, "the court is not bound by the law of evidence, except that on privilege." Mass. G. Evid. § 104(a) (2020).[8] See Bourjaily v. United States, 483 U.S. 171, 178 (1987) (Federal rules of evidence "allow[] the trial judge [in suppression hearings] to consider any evidence whatsoever, bound only by the rules of privilege"); Bunnell, 280 F.3d at 49, citing United States v. Schaefer, 87 F.3d 562, 570 (1st Cir. 1996) (same). This policy is based on the view that a "judge is much less likely than a lay jury to be intimidated by claims of scientific validity into assigning an inappropriate evidentiary value to [particular] evidence" (citation omitted).

---

[8] The Reporter's Note, however, arguably is inconsistent with this statement; the note provides that, "[w]hile out-of-court statements are admissible as to the determination of probable cause or the justification of government action, other evidence that would be incompetent under the rules of evidence is not admissible at suppression hearings." See Mass. G. Evid. § 1101 note (2020).

United States v. Posado, 57 F.3d 428, 435 (5th Cir. 1995).  At a hearing on a motion to suppress, judges should "err on the side of considering more, not less, information" and then determine the credibility, reliability, and weight to be applied to that evidence.  See United States v. Stepp, 680 F.3d 651, 669 (6th Cir. 2012) (Daubert requirements are inapplicable in suppression hearing).  Therefore, the judge did not err in allowing the admission of the challenged evidence at the suppression hearing.

The defendant argues also that the judge erred by dismissing Sweet's testimony regarding the threat study as "unhelpful."  The study reported that police officers were no better than lay people at identifying concealed weapons in video recordings.  The judge, however, found the literature on threat detection to be in its infancy.  Indeed, Sweet herself testified that the threat study, which was introduced in evidence, was the only study of its kind.  The study involved 107 people who each watched eight video recordings and attempted to identify whether the individuals in the recordings were carrying firearms.  In addition to the limitations inherent in relying upon only a single study involving a small number of individuals, the study itself noted several limitations in its design, including the lack of physiological stress on the part of those carrying the firearms, and a failure "to consider several environmental, contextual, and personal factors that could influence judgments

of concealment."  See Sweet, 41 Law and Human Behavior at 419.
Moreover, the officers in the study had not been trained in the
detection of concealed firearms.  Thus, the judge did not abuse
his discretion by giving little weight to the study.

The judge also decided that the six studies on implicit
bias and stereotype threat were of little assistance because
they were not authored by Sweet, and because they were not
sufficiently related to her research.  This decision was not an
abuse of discretion.  See Gomes, 453 Mass. at 509 (motion judge
decides weight and credibility).

Finally, the defendant contends that the officers'
testimony, even if properly admitted, was unreliable and
therefore should not have factored in the judge's decision.
Both officers explained their length of service, and their
training and experience with detecting individuals carrying
concealed firearms.  See Commonwealth v. Kennedy, 426 Mass. 703,
706 (1998) ("We prefer more extended testimony on an officer's
'inferential process'" [citation omitted]).  They then provided
specific and articulable observations, noted infra, that the
defendant's behavior was consistent with that of individuals
carrying concealed firearms.  The judge did not abuse his
discretion in relying upon the officers' testimony.  See Matta,
483 Mass. at 366 n.8 ("when an officer relies on his or her
training and experience to draw an inference or conclusion about

an observation made, the officer must explain the specific training and experience that he or she relied on and how that correlates to the observations made").

In challenging the judge's reliance on the officers' testimony, the defendant points to Sweet's testimony that there is no scientific literature to support an inference, based on the facts known to the officers when they were driving beside him, that the defendant was carrying a firearm. Accordingly, the defendant argues that the officers' testimony was unreliable. The judge, however, did not find Sweet's testimony credible and reliable. Even if he had, Sweet's testimony would not have shown affirmatively that the officers' testimony was false; rather, she testified that there was no scientific literature to support it.

With respect to the evidence available to the officers, the following evidence that the defendant was carrying a firearm weighs towards reasonable suspicion. The officers observed that the defendant was holding in his pocket an object that was consistent with the size of a firearm. See Rock, 429 Mass. at 612 ("officers saw a pronounced bulge protruding under the defendant's shirt"). The defendant kept his hands pressed against his body, which, based on the officers' training and experience, indicated that he might be trying to conceal a weapon. See Commonwealth v. Resende, 474 Mass. 455, 461 (2016)

(officer "observed the defendant holding his hand at his waist in a manner that [officer] believed from his training and experience was consistent with someone holding a gun"). The defendant proceeded to turn his body away from the officers in a manner that blocked them from seeing the object. See Resende, supra at 461; Commonwealth v. DePeiza, 449 Mass. 367, 371 (2007); Rock, 429 Mass. at 612.

c. Nervous and evasive behavior. The Commonwealth argues that the defendant behaved nervously and evasively, thereby contributing to reasonable suspicion. Specifically, the defendant did not make eye contact with the police throughout the interaction. He walked quickly, speeding up as the police continued to follow him, and he started looking in various directions, which indicated to the officers that he might attempt to flee.

In Warren, 475 Mass. at 539, we noted a "pattern of racial profiling" documented in the FIO reports from the Boston Police Department. Based on this pattern, we concluded that the flight of an African-American man from police "is not necessarily probative of . . . consciousness of guilt." Id. at 540. As discussed, supra, this pattern of racial profiling has been confirmed by more recent FIO reports. Even if this blight were eradicated today, a long history of race-based policing likely will remain imprinted on the group and individual consciousness

of African-Americans for the foreseeable future.  See
Commonwealth v. Phillips, 413 Mass. 50, 53 (1992) (describing
how informal policy of Boston police created "martial law" for
some young African-Americans).  See also Terry, 392 U.S. at 14
n.11 ("field interrogations are a major source of friction
between the police and minority groups" [citation omitted]);
Henning, The Reasonable Black Child:  Race, Adolescence, and the
Fourth Amendment, 67 Am. U. L. Rev. 1513, 1531 (2018) ("many
[B]lack youth . . . transfer negative attitudes and resentments
about the police from one generation to the next as youth
internalize the negative experiences of their community").

Thus, the reasoning of Warren remains relevant to the
analysis of reasonable suspicion.  That reasoning applies
equally to other types of nervous or evasive behavior in
addition to flight.  Just as an innocent African-American male
might flee in order to avoid the danger or indignity of a police
stop, the fear of such an encounter might lead an African-
American male to be nervous or evasive in his dealings with
police officers.  See Warren, 475 Mass. at 540.  We therefore
significantly discount the weight of the defendant's nervous and
evasive behavior.

d.  "High crime" area.  The officers testified regarding
recent crime in the area of the shooting and their encounter
with the defendant, and the judge factored this testimony into

his analysis.  The characterization of an area as "high crime" cannot justify the diminution of the civil rights of its occupants.  See United States v. Wright, 485 F.3d 45, 54 (1st Cir. 2007) (noting concern that "high crime" could be "used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business" [citation omitted]).  To guard against this risk, we consider this factor only if the "high crime" nature of the area has a "direct connection with the specific location and activity being investigated."  See Commonwealth v. Torres-Pagan, 484 Mass. 34, 41 (2020), citing Wright, supra at 53-54.

Here, the officers testified that there had been an ongoing feud between gangs in the area.  The police report, which was introduced in evidence, listed the incident numbers of other police reports of alleged gang-related crimes in the vicinity in the months prior to the shooting.  The dates, precise locations, and alleged perpetrators of those incidents were not provided. We are skeptical that these previous crimes, without additional details, demonstrate a "direct connection" with the defendant or the shooting at issue, so we do not consider the "high crime" nature of the area in our analysis.

e.  Weight.  As discussed, we do not give much weight to the defendant's nervous and evasive behavior.  We do afford significant weight to the defendant's proximity to the shooting

and the indications that he might have been carrying a firearm. Although the facts of this case present a close question, we conclude that there was sufficient evidence to establish a reasonable, articulable suspicion.

<u>Order denying motion to suppress affirmed</u>.