[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10083

_____

D.C. Docket No. 8:18-cr-00100-VMC-AAS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTHONY W. KNIGHTS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 10, 2021)

Before WILLIAM PRYOR, Chief Judge, ROSENBAUM, Circuit Judge, and MOORE,* District Judge.

WILLIAM PRYOR, Chief Judge:

---

* Honorable K. Michael Moore, Chief United States District Judge for the Southern District of Florida, sitting by designation.

Anthony Knights moved for rehearing en banc of our opinion that issued on August 3, 2020. We construe his motion as a petition for both rehearing en banc and panel rehearing. Fed. R. App. P. 35, 11th Cir. I.O.P. 2. We grant the motion for panel rehearing, vacate our original opinion in this appeal, and substitute in its place the following opinion.

This appeal requires us to decide whether officers violated Anthony Knights's right to be free from unreasonable seizures, under the Fourth Amendment, by conducting an investigatory stop without reasonable suspicion. Two officers saw Knights and Hozell Keaton around 1:00 a.m. in a car that was parked in the front yard of a home. Suspecting that the men might be trying to steal the car, the officers parked near it and approached Knights, who was in the driver's seat. When Knights opened the door, an officer immediately smelled marijuana. The ensuing search of Knights and the car revealed ammunition and firearms. Because Knights had felony convictions, a grand jury charged him with possession of a firearm and ammunition by a felon, 18 U.S.C. §§ 922(g)(1), 924(a)(2). Knights moved to suppress the evidence the officers found and the statements he made as fruit of an unlawful seizure. The district court denied the motion, convicted Knights, and sentenced him to 33 months of imprisonment. We affirm because Knights's interaction with the officers was a consensual encounter that did not implicate the Fourth Amendment.

2

## I. BACKGROUND

Late at night, Anthony Knights, Hozell Keaton, and Knights's nephew were smoking marijuana and listening to music while sitting in or standing near an Oldsmobile sedan in Tampa, Florida. The car was parked in a grassy area between the street and the white fence of a home that belonged to one of Keaton's relatives. The driver's side of the car was near the street and the passenger's side was near the fence.

On a routine patrol around 1:00 a.m., Officers Andrew Seligman and Brian Samuel of the Tampa Police Department saw two of the car's doors open with Knights and Keaton leaning into the car. The officers believed that Knights and Keaton might be stealing something from the car. They knew the area to be "high crime" and to have gang activity from their experience responding to multiple shootings and narcotics crimes. So they drove past the Oldsmobile for a better look. Knights and Keaton then "gave the officers a blank stare," and according to Officer Seligman, "kind of seemed nervous." The officers then heard someone unsuccessfully try to start the car. Thinking that Knights and Keaton "might be actually trying to steal the vehicle," the officers decided to investigate further.

Officer Seligman decided to turn around and park the patrol car near the Oldsmobile, which was parked on a grassy area next to the street in the direction of traffic for that side of the road. Officer Seligman parked on the street next to the

3

Oldsmobile in the wrong direction for traffic so that the trunk of the patrol car was nearly aligned with the trunk of the Oldsmobile. As Officer Seligman was parking, he trained his flashlight on Knights. According to Knights and Officer Seligman, the patrol car was parked in a way that would have allowed Knights to drive away. Officer Samuel left the patrol car and attempted to talk to Keaton, who was walking toward the house, but Keaton entered the house without responding.

The officers then approached Knights, who sat in the driver's seat and closed the car door. Officer Seligman approached the car with his flashlight and knocked on the driver's window. When Knights opened the door, Officer Seligman "was overwhelmed with an odor of burnt marijuana." Officer Seligman asked Knights if he owned the car, and Knights said that he and his wife owned it and gave Officer Seligman his driver's license and possibly the registration for the car. The officers later confirmed that his wife owned the car. When Officer Seligman asked Knights if he had marijuana, Knights said, "I'll be honest with you. It's all gone."

Officer Seligman then began to search for narcotics. He searched Knights's person and found a pill bottle containing several different kinds of pills. Officer Seligman arrested Knights and searched his car, starting with a backpack that Knights said contained a prescription for the pills. He found medical documents, a firearm cartridge, and a ski mask. He also found a scale, smoked marijuana, marijuana residue, a handgun, a rifle, and another firearm cartridge. Knights agreed

4

to an interview after the officers warned him of his rights, *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966), and he then admitted that he owned the handgun. Knights and the officers described the entire encounter as calm and amicable.

A grand jury indicted Knights on one count of possessing a firearm and ammunition as a felon, 18 U.S.C. §§ 922(g)(1), 924(a)(2). Before trial, Knights moved to suppress his admissions and the evidence the officers found during the search. He argued that they were fruit of an illegal seizure that occurred when— without reasonable suspicion—the officers parked behind his car or, at the latest, when they walked up to his car. The government responded that the incident "began as a police-citizen encounter" and did not turn into a "seizure" until the officers started searching for narcotics based on probable cause that Knights possessed marijuana, and alternatively, the officers had reasonable suspicion to conduct an investigatory stop.

The district court referred the motion to a magistrate judge who held a hearing and recommended granting the suppression motion. The magistrate judge recommended ruling that the officers conducted an investigatory stop because "the officers' show of authority, especially Officer Seligman, their locations as they approached the car, and the patrol car impeding Mr. Knights's ability to drive away, [established that] no reasonable person in Mr. Knights's position would feel free to leave or disregard the two officers." And because the magistrate judge

5

determined that the officers lacked reasonable suspicion and the physical evidence and statements were fruit of the unlawful seizure, she recommended granting the motion.

The district court, after considering briefing and oral argument, accepted the magistrate judge's recitation of the facts but disagreed with her recommendation and denied the suppression motion. It explained that the constitutionality of the officers' conduct turned on *when* they seized Knights because the odor of marijuana provided a lawful basis for seizing him. It ruled that the officers did not seize him when they parked their patrol car and walked up to Knights because "it was a police-citizen encounter involving no detention and no coercion." The district court found that Knights could have either driven away "with skilled driving" or walked away. It also relied on the absence of the police questioning Knights, displaying their weapons, touching him, asking for his identification, or having a verbal exchange with him.

Knights proceeded to a bench trial at which he and the government stipulated to the relevant facts. The district court adjudicated him guilty and sentenced him to a below-guideline sentence of 33 months of imprisonment.

On appeal, Knights argued that his perspective as a young black man was relevant to the question whether a seizure occurred. In our original opinion, we agreed that "the age and race of a suspect may be relevant factors," but we

6

concluded that they were not decisive in Knights's appeal. Because a reasonable person in his position would have felt free to leave, he was not seized, and so we affirmed his conviction. Knights then petitioned for rehearing en banc. In his petition, he argued that we erred by not treating his identity as "a factor that matters." According to Knights, the correct inquiry was whether a reasonable young black man would have felt free to drive or walk away from the police. Upon reconsideration, and with the benefit of additional briefing by the parties, we substitute this opinion to address that issue.

## II. STANDARDS OF REVIEW

"A district court's ruling on a motion to suppress presents a mixed question of law and fact." *United States v. Perez*, 443 F.3d 772, 774 (11th Cir. 2006) (internal quotation marks omitted). We review its legal conclusions *de novo*, and we accept its factual findings unless they are clearly erroneous. *Id.* We construe the facts in the light most favorable to the government because it prevailed in the district court. *Id.*

## III. DISCUSSION

The Fourth Amendment protects "[t]he right of the people . . . against unreasonable searches and seizures." U.S. Const. amend. IV. A "seizure" does not occur every time a police officer interacts with a citizen. Officers are free to "approach[] individuals on the street or in other public places and put[] questions

7

to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002). In these consensual encounters, the officers need no suspicion because the Fourth Amendment is not implicated. *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Perez*, 443 F.3d at 777–78. But officers need reasonable suspicion if an encounter becomes an investigatory stop. *See Bostick*, 501 U.S. at 434; *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011). An investigatory stop occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Jordan*, 635 F.3d at 1185 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

The test for whether the officer restrained a citizen's liberty is whether "a reasonable person would feel free to terminate the encounter." *Drayton*, 536 U.S. at 201; *see also Immigr. & Naturalization Serv. v. Delgado*, 466 U.S. 210, 215 (1984). We must imagine how an objective, reasonable, and innocent person would feel, not how the particular suspect felt. *Drayton*, 536 U.S. at 202; *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988). All the circumstances are relevant, *Bostick*, 501 U.S. at 439, including "whether a citizen's path is blocked or impeded"; whether the officers retained the individual's identification; "the suspect's age, education and intelligence; the length of the . . . detention and questioning; the number of police officers present"; whether the officers displayed their weapons; "any physical touching of the suspect[;] and the language and tone of voice of the

8

police." *Perez*, 443 F.3d at 778 (internal quotation marks omitted); *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.).

Knights argues that the district court should have suppressed his admissions and evidence because the officers stopped him without reasonable suspicion when they parked the patrol car close to his car and then approached him. He does not challenge any seizure that occurred after that point. The government responds that the encounter between Knights and the officers was initially consensual and alternatively that the officers had reasonable suspicion. Because we conclude that the encounter was initially consensual, we need not decide whether the officers had reasonable suspicion.

In this encounter, a reasonable person would have felt free to leave. In fact, Knights's companion Keaton did leave. As Keaton had done, Knights was physically capable of walking away. He also could have driven away, and the officers did not display their weapons, touch Knights, or even speak to him—let alone issue any commands or ask him for his identification and retain it. And before the officers approached Knights, they did not activate the lightbar or siren on the patrol car, and as we have mentioned, they allowed Keaton to leave the car, ignore their invitation to talk, and enter the home where the car was parked.

In similar circumstances, we have concluded that an officer did not restrain a suspect. In *Miller v. Harget*, an officer parked behind a suspect's parked car—

9

blocking him from driving away—and then "turned on his 'window lights'" and approached the suspect's car on foot. 458 F.3d 1251, 1257–58 (11th Cir. 2006). We reasoned that when the officer quickly approached the suspect's car, he "did not do anything that would appear coercive to a reasonable person. For example, he did not draw his gun, give any directions to [the suspect], or activate his roof lights." *Id.* at 1257. Because the officer did not make a "show of authority that communicated to the individual that his liberty was restrained," it was not an investigatory stop. *Id.* at 1258 (alterations adopted) (internal quotation marks omitted). For the same reason, a reasonable person in Knights's position would have felt free to leave; the officers did not make a show of authority communicating that Knights was not free to leave.

Knights disagrees and relies on our precedent *United States v. Beck*, in which we concluded that the officers stopped the defendant because of the proximity between his car and the officers' car. 602 F.2d 726, 727, 729 (5th Cir. 1979). Two officers pulled their patrol car alongside Beck and his passenger's parked and idling car and "engaged [them] in conversation" about what they were doing there. *Id.* at 727. We explained that "[b]y pulling so close to the [car], the officers effectively restrained the movement of Beck and his passenger" and it was clear "that they were not free to ignore the officers and proceed on their way." *Id.* at 729 (alterations adopted) (internal quotation marks omitted). Knights argues that

10

the same is true here because the way in which the officers parked blocked him from driving away, and the officers also impeded his ability to walk away.

We are unpersuaded that *Beck* controls here. The officers approached Knights in a meaningfully different manner. Instead of parking alongside his car and engaging him in conversation, they parked near his car—with enough space for him to drive away—and approached his car to try to speak to him, without conveying that Knights was required to comply. Indeed, as we have noted, just a moment earlier, Knights's companion obviously felt free to leave the car, ignore the officer's invitation to speak with him, and enter the house.

Knights's other arguments are also unpersuasive. He argues that a reasonable person would not have felt free to walk away because doing so would have required abandoning his car in a high-crime area. But we disagree because two officers would have been near the car, and Knights could have easily returned to the car as soon as they left. He also repeatedly mentions that Officer Seligman used a flashlight when he approached the Oldsmobile. But we fail to see how a flashlight communicated a show of authority in these circumstances. A flashlight would also be used by "an officer approach[ing] a stranded motorist to offer assistance," *Miller*, 458 F.3d at 1258, or by an ordinary person outside in the middle of the night. Knights also argues that the presence of *two* officers weighs in favor of the encounter being a seizure, and that "young African-American men feel

11

that they cannot walk away from police without risking arrest or bodily harm." Although the presence of multiple officers and the age of a suspect may be relevant factors, *Perez*, 443 F.3d at 778, the totality of the circumstances establish that this encounter was not coercive.

Moreover, unlike age, the race of a suspect is never a factor in seizure analysis. In our original opinion, we cited *United States v. Mendenhall*, 446 U.S. 544, for the proposition that race might be a relevant factor. But *Mendenhall* establishes that race is "not irrelevant" to the *voluntariness* of a seizure; it did not address the relevance of race to the existence of a seizure. *Id.* at 557–58; *see also United States v. Easley*, 911 F.3d 1074, 1081 (10th Cir. 2018) (recognizing that "the Supreme Court has [n]ever considered race a relevant factor" in the latter context). Nor have our sister circuits considered race in the threshold seizure inquiry. *But see United States v. Smith*, 794 F.3d 681, 688 (7th Cir. 2015) (stating in dicta, based on *Mendenhall*, that "race is 'not irrelevant' to the question of whether a seizure occurred" but not analyzing its import with respect to that appeal). Upon further review, we clarify that race may not be a factor in the threshold seizure inquiry.

We may not consider race to determine whether a seizure has occurred. True, as Knights points out, race can be relevant in other Fourth Amendment contexts. *See, e.g.*, *United States v. Brignoni-Ponce*, 422 U.S. 873, 886–87 (1975).

12

For example, we consider a suspect's personal characteristics to decide whether he gave consent to a search or seizure because that question is subjective. *United States v. Spivey*, 861 F.3d 1207, 1215 (11th Cir. 2017). But the existence of a seizure is an objective question. *Craig v. Singletary*, 127 F.3d 1030, 1041 (11th Cir. 1997) (en banc). We ask whether a reasonable person would have believed he was not free to leave in the light of the totality of the circumstances. *Id.* The circumstances of the *situation* are key to this inquiry—in particular, the police officer's objective behavior. *Miller*, 458 F.3d at 1258 n.4. An objective test has important virtues: we can readily apply it, and "law enforcement [can] know ex ante what conduct implicates the Fourth Amendment." *Easley*, 911 F.3d at 1082.

We consider a suspect's personal characteristics in our seizure analysis only insofar as they have an "objectively discernible relationship to a reasonable person's understanding of his freedom of action." *J.D.B. v. North Carolina*, 564 U.S. 261, 275 (2011). For example, we can consider age because both we and the police can draw "commonsense conclusions" about the effect of age on a person's perception of his freedom to leave that "apply broadly to children as a class." *Id.* at 272 (internal quotation marks omitted). By contrast, most personal characteristics, including race, do not lend themselves to objective conclusions.

Knights argues that an objectively discernible relationship follows from the existence of racial disparities in the frequency of police stops, arrests, and other

13

interactions. But even if empirical research can provide evidence of how individuals of different demographics have interacted with or perceive the police, this research also reinforces that perceptions vary within groups. *See, e.g.*, David K. Kessler, *Free to Leave? An Empirical Look at the Fourth Amendment's Seizure Standard*, 99 J. Crim. L. & Criminology 51, 77 & n.151 (2009). "There is no uniform life experience for persons of color, and there are surely divergent attitudes toward law enforcement officers among members of the population." *Easley*, 911 F.3d at 1082.

Even if we could derive uniform—or at least predominant—attitudes from a characteristic like race, we have no workable method to translate general attitudes towards the police into rigorous analysis of how a reasonable person would understand his freedom of action in a particular situation. Take the evidence Knights offers that black individuals as a group tend to be wary of the police. How could we consider that tendency, in conjunction with other factors, in a systematic way? In which situations is race a relevant factor? How would we weigh race against countervailing considerations? Would that weight vary with the race of a police officer or a particular police department's history with its community? With so many open questions like these, short of assuming that all interactions between police officers and black individuals are seizures, we would be left to pure speculation. *See United States v. Alvarez-Sanchez*, 774 F.2d 1036, 1040 (11th Cir.

1985) ("Not every encounter between law enforcement officers and an individual constitutes a seizure within the meaning of the [F]ourth [A]mendment.").

And even if we could devise an objective way to consider race, we could not apply a race-conscious reasonable-person test without running afoul of the Equal Protection Clause. *See Easley*, 911 F.3d at 1082. Just as "the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached," *Chesternut*, 486 U.S. at 574, it does not vary with the race of the individual being approached. *Cf. Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race."). So we may not consider race in deciding whether a seizure has occurred, and the objective circumstances of Knights's encounter with the police remain dispositive.

## IV. CONCLUSION

We **AFFIRM** Knights's conviction.

ROSENBAUM, Circuit Judge, concurring in the judgment:

I agree with the panel that the Equal Protection Clause precludes courts from considering race as a relevant factor in evaluating whether a citizen's encounter with police is coercive or consensual under the Fourth Amendment. But I am deeply concerned that the test we apply in these cases—the "free to leave"/affirmative-acts-of-coercion test—has become unworkable and dangerous. For these reasons, I write to emphasize the perils that ambiguous police interactions can cause and to respectfully suggest that the Supreme Court consider adopting a bright-line rule requiring officers to clearly advise citizens[1] of their right to end a so-called consensual police encounter.

As I have indicated, the test for a seizure under the Fourth Amendment purports to turn on whether a reasonable innocent person in the defendant's position at the time of the police interaction would feel free to leave or otherwise end the encounter. *Florida v. Royer*, 460 U.S. 491, 502 (1983) (plurality opinion); *id.* at 511–12 (Brennan, J., concurring); *see also Florida v Bostick*, 501 U.S. 429, 434 (1991) ("So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual . . . .") (citation omitted); *id.* at 438 (explaining that "the 'reasonable person' test presupposes an *innocent* person").

---

[1] I use the term "citizen" in the generic sense, meaning "a civilian as distinguished from a specialized servant of the state." *Citizen*, Dictionary by Merriam-Webster, https://www.merriam-webster.com/dictionary/citizen (last visited Mar. 1, 2021).

16

And that makes sense:  by definition, a person who is truly free to leave (as the test calls for), of course, has not been "seized" at all under the Fourth Amendment.

But that description can be a bit misleading.  Under Supreme Court (and Eleventh Circuit) precedent, even if a reasonable innocent person in the defendant's place, in reality, would not have felt "free to leave," case law nonetheless can require the conclusion that he would have.  If the officers involved did not engage in what we have held amount to sufficient affirmative acts of coercion, then no Fourth Amendment "seizure" occurs, regardless of whether a reasonable innocent person would have felt "free to leave."

Perhaps the most troubling aspect of this hybrid "free-to-leave"/affirmative-acts-of-coercion standard is the Russian Roulette nature of it.  The hybrid test foists on the citizen the complete responsibility for ascertaining whether the officer is detaining him.  And the citizen must draw his conclusion based on only his best guess—a conjecture that can carry with it great risk to both the citizen and the officer.

If the citizen presumes incorrectly that he is free to leave, the officer may mistake for resistance or some type of threat the citizen's efforts to end the encounter.  Then the officer may engage in physical acts of restraint—or even worse, use deadly force—to obtain cooperation or neutralize the misperceived threat from the citizen who did not even realize he was detained in the first place.  And even if

17

the officer does not engage in physical acts of restraint, he may arrest the citizen. This system is not ideal for anyone (including officers), but it can present an especially tricky dilemma for Black citizens, who studies indicate historically have disproportionately suffered violence in law-enforcement encounters.[2]

The test also fails to account for reality in another respect: it disregards the actual intentions of officers. So if the court with the crystal-clear vision of hindsight concludes based on the totality of the circumstances that a reasonable citizen would have felt free to leave, it makes no difference to the analysis that, as a matter of fact, both the officer and the citizen believed he was not. The court will nonetheless hold that the citizen was not "seized" under the Fourth Amendment. In these circumstances, where no reasonable suspicion justifies the officer's intended seizure but the court concludes that the citizen was not seized, anyway, the Fourth Amendment's protection from unreasonable seizures is but an illusion.

---

[2] According to a scientific study published by the National Academy of Sciences, "Black men are about 2.5 times more likely to be killed by police over the life course than are white men," and "Black women are about 1.4 times more likely to be killed by police than are white women." Frank Edwards et al., *Risk of Being Killed by Police Use of Force in the United States by Age, Race-ethnicity, and Sex*, 116 Proc. Nat'l Acad. Sci. U.S.A., 16793, 16794 (2019). Similarly, a study printed in the *American Journal of Preventive Medicine* found that Black people were disproportionately victims of lethal force by law enforcement, "with a fatality rate 2.8 times higher among blacks than whites." Sarah DeGue et al., *Deaths Due to Use of Lethal Force by Law Enforcement: Findings from the National Violent Death Reporting System, 17 U.S. States, 2009–2012*, 51 American J. of Preventive Med. S173, S173 (2016). "[B]lack victims were [also] more likely to be unarmed (14.8%) than white (9.4%) or Hispanic (5.8%) victims." *Id.*

A citizen should not have to bet his and the officer's well-being on guessing correctly that he is free to leave. And an officer should not be placed in a situation where he mistakenly believes he must engage in physical force because the citizen presumed incorrectly. Nor should a citizen have to forfeit his Fourth Amendment right to be free from unreasonable seizures merely because courts believe—with the benefit of reflection, untainted by the palpable pressure of split-second decision-making—that the citizen should have felt free to leave even if he, in fact, was not. Policing is difficult and dangerous work. But under the hybrid test, so is being a citizen trying to exercise his Fourth Amendment right to be free from unreasonable seizures.

We could remove some of the risk to officers and citizens by eliminating much of the ambiguity surrounding so-called consensual encounters. As some police departments have already discovered and now require as a standard practice, an officer's straightforward announcement of the citizen's Fourth Amendment status prevents dangerous misreads, helping to protect both officers and citizens. So we could presume an encounter to be consensual where officers who wish to investigate a citizen but lack reasonable suspicion advise the citizen at the outset of the encounter that he is free to decline to speak with the officers. Conversely, an interaction could become presumptively non-consensual when the officer in the same position fails to take this step. Not only would such a bright-line rule reduce

19

the risk to officers and citizens in so-called consensual encounters, it would also help close the gap between the reality of these situations and how they are treated under the law.

To be sure, the Supreme Court has, in the past, rejected similar suggestions of a bright-line rule for separating consensual from non-consensual encounters. But the need for such a rule to protect police and citizens alike has become more obvious since then.

Below, in Section I, I describe why current precedent required affirmance of the district court's denial of Knights's suppression motion. Section II discusses the numerous pitfalls of the current hybrid "free to leave"/affirmative-acts-of-coercion test. In Section III, I explain why, as the panel asserts, equal-protection analysis precludes us from considering race under the current "free to leave"/affirmative-acts-of-coercion test Fourth Amendment seizure analysis applies. Then Section III shows why, regardless of whether courts can consider race in conducting the "free to leave"/affirmative-acts-of-coercion test, race can bear on the reality that the test purports to assess. And finally, in Section IV I examine how a bright-line test would help remedy these problems.

## I.

The success of Knights's motion to suppress hinges on whether a reasonable innocent person in his position would have felt free to leave or end the interaction

with the two officers.  To evaluate this, we examine the totality of the circumstances, *Bostick*, 501 U.S. at 437, including whether the officers took any affirmative coercive actions that would make a reasonable person feel he is not free to leave. *See id.* at 436; *Miller v. Harget*, 458 F.3d 1251, 1258 (11th Cir. 2006) (explaining that the test is whether the officers "exhibited coercion that would make [the defendant] feel he was not free to leave").

Our panel opinion highlights several factors suggesting that Knights's encounter with the police was consensual.  *See* Panel Op. at 9.  It focuses largely on what did not occur during the incident:  the uniformed officers did not activate their patrol-car lights and siren[3], display their weapons, physically touch Knights, immediately speak to Knights as they approached him, nor physically block his car with their cruiser (although they made it more difficult to drive away).  *See id.*

Perhaps the strongest factor suggesting that a reasonable person would have felt free to leave was that Hozell Keaton, who had been leaning into the open passenger-side door of the car where Knights had the driver's door open, actually left the car area just as he saw the officers park their patrol car in front of Keaton's house.  Even after Officer Samuel got out of the cruiser and tried to get Keaton's

---

[3] The magistrate judge's factual findings entered after an evidentiary hearing do not indicate that she found that the officers activated their lights, although Knights testified that, "[t]o [his] knowledge," the officers did.  Knights did not challenge the magistrate judge's factual finding.  And though on appeal, he mentioned this testimony from the hearing, he did not argue that the officers activated their lights.

attention, Keaton, who was already near the front door, ignored him, continued to walk away, and entered the house. That no officer took further action with respect to Keaton might have suggested to a reasonable person in Knights's position that he could have also avoided the interaction with officers.

But once Keaton was inside the home, Knights faced different circumstances than Keaton had a moment earlier. When Keaton went into his home, Knights got into the car and closed the doors. Then Officer Seligman approached Knights as he sat there. The situation left Knights with, at best, three potential options to retreat from the police encounter: (1) open his car door and walk past one officer standing directly in his path, as he tried to decline to speak with both officers; (2) attempt to start and maneuver his car, which the officers knew had just failed to turn over, around the officers and their cruiser—a task the magistrate judge found Knights "would have had significant difficulty doing . . . without hitting the patrol car or an officer"; or (3) remain in the dead car with the doors closed.

Although Knights chose to remain in the car, the officers nonetheless walked closer to his vehicle until one knocked on the window. Knights's efforts to signal that he was not interested in chatting (by shutting himself in his car) did not appear to work. Besides that, Knights knew the officers viewed the neighborhood as "high crime," and it was dark at one in the morning—factors that can understandably amplify an officer's perception of a threat, whether or not a real threat existed. And

22

since the officers were aware that the car Knights was in would not start, no reasonable person in Knights's position would have believed it was realistically possible to leave the car sitting in the driveway and walk away without direct police interaction.

Based on these circumstances, it's hard to say that a reasonable innocent person in Knights's place truly would have felt free to try to end the encounter with the officers. But a finding that a reasonable person would not have felt free to leave is not enough under current case law.

Without an affirmative coercive act by an officer, our precedent requires the conclusion that Knights was not seized. Indeed, "[t]his Court has decided on several occasions that a police officer does not seize an individual merely by approaching a person in a parked car," even in some cases when the officers block the parked car from leaving. *Miller*, 458 F.3d at 1257; *see also United States v. Baker*, 290 F.3d 1276, 1278-79 (11th Cir. 2002).[4] And because no other affirmatively coercive

---

[4] The magistrate judge's report and recommendation relied on *United States v. Beck*, 602 F.2d 726 (5th Cir. 1979), to conclude that the officers seized Knights when they parked their cruiser in a way that made it more difficult for Knights to leave the scene in his car. ECF No. 51 at 9-11. In *Beck*, our predecessor Court determined that when officers parked next to the defendant's car in that case, "'they clearly took the sort of action contemplated by *Terry v. Ohio*' and its definition of a 'stop.'" *Id.* at 10 (quoting *Beck*, 602 F.2d at 728). The problem is that *Beck* was issued in 1979, before the Supreme Court decided *Bostick*, 501 U.S. 429, in 1991, which put a gloss on the "free to leave" test. So we are bound by the post-*Bostick* case law that applies that gloss. In *Bostick*, two armed officers with badges boarded a bus that was at a stopover during a lengthy journey. *Id.* at 431. They asked the defendant to inspect his ticket and identification and then to search his luggage. *Id.* at 431-32. They found contraband, and the defendant sought to suppress it as the product of an unreasonable seizure. *Id.* In discussing considerations that the lower court needed to make on remand to determine whether the defendant had been seized, the

23

factors identified in our case law appear in the record before us, our precedent bound us to conclude that Knights's interaction with police was "consensual" and to affirm the denial of his motion to suppress. *See United States v. De La Rosa*, 922 F.2d 675, 678 (listing coercive factors).

## II.

The outcome in Knights's case and others like it can be unsatisfying: when we hold that a defendant was not "seized" for Fourth Amendment purposes, even though—if we are being realistic—we know that a reasonable person in his place likely would not have felt free to leave, the Fourth Amendment's protections do not feel entirely real. *See*, *e.g.*, *Bostick*, 501 U.S. at 436 (concluding that "the mere fact that Bostick did not feel free to leave the bus does not mean that the police seized him"); *United States v. Thompson*, 941 F.2d 66, 68, 70 (2d Cir. 1991) (holding that

---

Court stated that "when the person is seated on a bus and has no desire to leave, the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter." *Id*. at 435-36. The Court further opined that the fact that the defendant did not feel free to leave while sitting on the bus "says nothing about whether or not the police conduct at issue was coercive." *Id*. at 436. The Court distinguished the bus situation from a scenario in which a person is freely walking down the street and "it makes sense to inquire whether a reasonable person would feel free to continue walking." *Id*. Since *Bostick* issued, this Court has held that when an armed officer approaches a person in a parked car, that does not, in and of itself, cause a seizure. *See*, *e.g.*, *Miller*, 458 F.3d at 1257-58; *Baker*, 290 F.3d at 1279 (officer approached vehicle stopped in traffic). And in *Miller*, even though the officer parked behind the subject car, thereby wholly preventing it from leaving, this Court concluded no Fourth Amendment seizure had occurred, since the citizen there did not demonstrate an intent to drive away. *Id*. at 1257. *Miller* remains good law in this Circuit, so we are bound by it. And here, the officers knew the car would not start.

24

the defendant was not seized even though she testified "she did not feel free to leave when the officers began to question her").

Knights's case is emblematic of the issues that plague the hybrid "free to leave"/affirmative-acts-of-coercion test:     (1) the test ignores the inherent coerciveness of being approached by armed law-enforcement agents, a situation that most people don't feel free to leave, even in the absence of affirmative acts of coercion; (2) it ignores the officer's actual intentions in stopping the defendant; and (3) it unfairly imposes on the citizen the entire burden of correctly guessing whether, under the law, an encounter is "consensual," as well as the consequences of that decision.

First, I begin with the test's failure to account for the inherent coerciveness of being approached by an armed law-enforcement agent.  This defect increases the likelihood that the test will fail to accurately identify when, in reality, a reasonable citizen would not feel free to leave a police encounter.

Within the comfort of our chambers, we imagine how we think a "reasonable person" like Knights would feel in a "high-crime" neighborhood as two armed officers approach in the wee hours of the morning.  Commentators have observed that when we speculate on whether a reasonable innocent person would feel free to leave a given encounter, we tend to "bas[e] decision[s] on 'minute factual differences' that courts have determined to be crucial, but which [arguably] bear

25

little relationship to the individual's actual freedom to walk away." Josephine Ross, *Can Social Science Defeat A Legal Fiction? Challenging Unlawful Stops Under the Fourth Amendment*, 18 Wash. & Lee J. Civ. Rts. & Soc. Just. 315, 326 (2012) (quoting Edwin J. Butterfoss*, Bright Line Seizures: The Need for Clarity in Determining When Fourth Amendment Activity Begins*, 79 J. Crim. L. & Criminology 437, 439-40 (1988)). So our speculation does not always match reality.

In fact, studies demonstrate that most people do not feel free to terminate an officer-initiated encounter—even in the absence of any affirmative coercive acts. For example, Professor David K. Kessler surveyed more than 400 randomly selected Boston residents about whether they would feel free to leave when approached on a bus or on the sidewalk by law enforcement. *See* David K. Kessler, *Free to Leave? An Empirical Look at the Fourth Amendment's Seizure Standard*, 99 J. Crim. L. & Criminology 51, 52 (2009). The questionnaire posed the question innocuously: "You are walking on the sidewalk [or "You are riding the bus"]. A police officer comes up to you and says, 'I have a few questions to ask you.' Assume you do not want to talk to the officer." *Id.* at App. A. Then the respondent rated on a scale of 1 to 5 "how free [the respondent] would feel to walk away without answering or to decline to talk with the police officer," with 1 indicating "[n]ot free to leave or say no," 3 meaning "[s]omewhat free to leave or say no," and 5 indicating "[c]ompletely free to leave or say no." *Id.*

Almost 80% selected 3 or lower, including about 50% who selected 1 or 2. *Id.* at 74-75. And those results likely overestimate how often people feel free to leave when interacting with the police because, as Kessler explained, "[t]he coercive pressures experienced when actually dealing with a police officer are likely to make one feel less free than when one is standing in a train station" conversing with a student researcher. *Id.* at 80.

And while the Kessler study demonstrates that the vast majority of people—whether white or Black—do not feel free to leave when approached by police, as I note in Section III of this concurrence, other studies and anecdotal evidence show this is especially true for Black individuals.

The current test's failure to account for the approaching officer's actual intentions only compounds these deficiencies. *See Miller*, 458 F.3d at 1258 n.4. Under the current test, courts can and do determine that a person was free to leave even if, as a matter of fact, the officer who stopped that individual thought he was not. In that scenario, the officer may have, in reality, detained the individual without the necessary reasonable suspicion. Yet the law says no detainment has occurred, making the Fourth Amendment's protection against unreasonable seizures illusory. In that sense, the test operates as a legal fiction—a seizure in fact is not a seizure under the law. So police can initiate "'encounters' in the hope that criminal activity will be revealed" and be "secure in the knowledge that these encounters will remain

27

beyond the purview of the Fourth Amendment." Bennett Capers, *On Justitia, Race, Gender, and Blindness*, 12 Mich. J. Race & L. 203, 221 (2006).

Finally, the hybrid test makes the citizen shoulder the entire burden of determining whether a stop has occurred. This framework "assumes that the choice to decline a police request is unburdened, that no negative consequences will accompany a failure to comply, and therefore that individuals will readily assume" that they may walk away. Margaret Raymond, *The Right to Refuse and the Obligation to Comply: Challenging the Gamesmanship Model of Criminal Procedure*, 54 Buff. L. Rev. 1483, 1502 (2007). But "[r]easonable people are sometimes risk averse . . . and there are several downside risks involved in disregarding police directions." *Id.* at 1503.

## III.

And this is all the more true for Black citizens. Yet today's panel opinion concludes that it must reject the proposition that race may be considered in determining whether a Fourth Amendment seizure occurs. As I explain below, I agree that the law requires this answer. But studies suggest that Black and white individuals do not equally feel "free to leave" citizen-police encounters. So it is worth considering why and what can be done to improve the ability of people of all races to feel equally able to exercise their Fourth Amendment rights to leave a legally consensual citizen-police encounter.

28

I begin with the panel opinion's rejection of race as a factor in the Fourth Amendment test for determining whether a seizure has occurred.  The panel opinion reaches its conclusion for two reasons.  First, the panel opinion asserts that we cannot consider race because the test for ascertaining whether a Fourth Amendment seizure occurs is an objective one, and unlike with age, we cannot "draw 'commonsense conclusions' about the effect of [race] on a person's perception of his freedom to leave that 'apply broadly to [members of a given race] as a class.'"  Panel Op. at 13.  Second, the panel opinion determines that equal-protection analysis prevents us from accounting for race in an objective (as opposed to subjective) analysis.  I do not consider the validity of the panel's first conclusion because, regardless, I agree that it is right about its second.

The Fifth Amendment's Due Process Clause includes an equal-protection component.  *See Bolling v. Sharpe*, 347 U.S. 497, 498-500 (1954).  Under it, we must analyze racial classifications—including classifications that seek to remedy racial inequality—using strict scrutiny.  *Johnson v. California*, 543 U.S. 499, 505 (2005).[5]  To satisfy strict scrutiny, the party seeking to adopt a racial classification must show that the racial classification at issue furthers a compelling interest and

---

[5] Although *Johnson* involves the Fourteenth Amendment's Equal Protection Clause, the same analysis applies to Fifth Amendment equal-protection analysis of laws that classify based on race.  *See Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995).

that the rule based on that racial classification is narrowly tailored to achieve that compelling interest. *See id.*

As relevant here, I would find a compelling interest exists in ensuring that all citizens enjoy the same ability to assert their Fourth Amendment rights in citizen-police encounters, regardless of their race. Because the current test for whether a seizure occurs turns on whether a reasonable innocent person in the citizen's place would feel "free to leave" a police interaction, it's important that the hypothetical "reasonable innocent person" would feel equally "free to leave," regardless of her race.

But as a matter of the commonsense reality of police-citizen interactions, Black individuals from every background have long expressed that race can and does affect whether a citizen feels "free to leave" a police encounter. Of course, we wish race were not relevant. But wishing does not make it so. *See Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996) (explaining that "as a practical matter neither society nor our enforcement of the laws is yet color-blind"). The evidence demonstrates that race can matter during interactions with the police.

Black Americans on the whole are 2.5 times more likely to be shot and killed by police officers than white Americans.[6]  Wesley Lowery, *Aren't More White*

---

[6] In fact, studies demonstrate that the disparities in force used against Black and Latinx individuals, on the one hand, and white ones, on the other, are even higher when we account for, among other things, "selection bias" in the initial decisions to stop individuals. *See generally* Dean

*People than Black People Killed by Police?  Yes, but No*, Wash. Post (July 11, 2016), https://www.washingtonpost.com/news/post-nation/wp/2016/07/11/arent-more-white-people-than-black-people-killed-by-police-yes-but-no/; *see also supra* note 2; Radley Balko, *There's Overwhelming Evidence that the Criminal Justice System is Racist. Here's the Proof*, Wash. Post (June 10, 2020), https://www.washingtonpost.com/graphics/2020/opinions/systemic-racism-police-evidence-criminal-justice-system/ (collecting evidence on racial disparities in police shootings and use-of-force incidents); *Jamison v. McClendon*, 476 F. Supp. 3d 386, 390-91 nn. 1-19 (S.D. Miss. Aug. 4, 2020) (cataloguing some Black Americans' deaths in police encounters).  The pattern is even more pronounced with respect to young Black men between the ages of 15 and 19:  in a recent study, they were found to be 21 times more likely than their white counterparts to be killed during police encounters.  Ryan Gabrielson et al., *Deadly Force, in Black and White*, ProPublica (Oct. 10, 2014), https://www.propublica.org/article/deadly-force-in-black-and-white.   So it is no wonder that "Black male teens still report a fear of police and a serious concern for their personal safety and mortality in the presence of police officers." *Jamison*, 476 F. Supp. 3d at 414-15 (internal quotation marks omitted).

---

Knox et al., *Administrative Records Mask Racially Biased Policing*, 114 Am. Pol. Sci. Rev. 619 (2020).

When we consider unarmed individuals, Black Americans are five times more likely than white Americans to be killed by police. Lowery, *supra*. And these disproportionate rates of deadly encounters persist, despite findings that, even accounting for threat level, "[B]lack Americans who are fatally shot by police are no more likely to be posing an imminent lethal threat to the officers at the moment they are killed than white Americans fatally shot by police." *Id*.

Because of these circumstances, Black Americans' lived experiences make them materially less likely than white Americans to believe they have the freedom to leave an interaction with the police. Indeed, "the dynamics surrounding an encounter between a police officer and a black [citizen] are quite different from those that surround an encounter between an officer and the so-called average, reasonable person." Tracey Maclin, *"Black and Blue Encounters"—Some Preliminary Thoughts About Fourth Amendment Seizures: Should Race Matter?*, 26 Val. U.L. Rev. 243, 250 (1991).

For Black citizens, the fear of violence often overlays the entire law-enforcement encounter. Because of these circumstances, commentators have concluded that Black people have "internalized racial obedience toward, and fear of, the police." Devon W. Carbado, *(E)racing the Fourth Amendment*, 100 Mich. L. Rev. 946, 966 (2002). "They work their identities in response to, and in an attempt to preempt, law enforcement discipline"; "[i]t is intended to signal acquiescence and

32

respectability." *Id.*; *see also* Capers, *supra*, at 221 n.90. Black people often tread more carefully around law enforcement than the Court's hypothetical reasonable person does because of the grave awareness that a misstep or discerned disrespectful word may cause the officer to misperceive a threat and escalate an encounter into a physical one.[7]

Black community members have explained that, for them, the "whole goal" of a police encounter is to "just kind of stay alive. Just make it to the next day." *A Black Mother and Son on "The Talk": 'When I get Pulled Over by a Police Officer, I Do Not Have Any Rights'*, KJZZ (June 11, 2020), https://kjzz.org/content/1591087/black-mother-and-son-talk-when-i-get-pulled-over-police-officer-i-do-not-have-any; *see also* Carbado, *(E)racing*, *supra*, at 953-54. Towards that end, parents have long found it necessary to have "The Talk"[8] with their Black children to try to help

---

[7] *See* Ross, *supra*, at 318 ("When I told a class of students at Howard University School of Law that they can walk away when police officers approach to ask them questions, they rebelled. 'Not in my neighborhood,' said one student. 'You can get yourself arrested,' another law student said. 'Or shot,' added another. . . . One student in my class who was a former police officer declared that it would be irresponsible for us to tell young people that they can walk away from police.").

[8] Generations of Black children are familiar with "The Talk." *Utah v. Strieff*, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, J., dissenting) (describing "The Talk"); *United States v. Black*, 707 F.3d 531, 541 (4th Cir. 2013) (same). Generally, parents have "The Talk" with their kids about how to interact with law enforcement so no officer will have any reason to misperceive them as a threat and take harmful or fatal action against them. So for example, Black children are taught that, if stopped by an officer while in their car, they should roll down all car windows, place both hands open and in plain view (or on the steering wheel), keep their composure and be perfectly respectful even if they feel the officer is mistreating them, ask for permission before moving their hands, and comply with all the officer's requests. If, like I, a reader has never experienced "The Talk" firsthand, watching *Black Parents Explain How to Deal with the Police*, YouTube (Feb. 6, 2017), https://www.youtube.com/watch?v=coryt8IZ-DE, or something similar, though

them keep safe when they encounter the police.  When a citizen perceives staying

alive as the "whole goal" of a police interaction, it is difficult to say that an encounter

is truly "consensual."

And there is no real question that Black citizens view themselves as sharing a

common historic experience concerning police encounters.  That is why generations

of children have had to grow up with "the Talk."  And it is why even a Black United

States Senator and a Black former President of the United States acknowledge the

same shared experience as Black citizens from all other walks of life.  *See* Tim Scott,

*GOP Sen. Tim Scott*: *I've Choked on Fear When Stopped by Police. We Need the*

JUSTICE *Act*, USA TODAY (June 18, 2020), https://www.msn.com/en-

us/news/opinion/gop-sen-tim-scott-ive-choked-on-fear-when-stopped-by-police-

we-need-the-justice-act/ar-BB15FLvH ("I, like many other Black Americans, have

found myself choking on my own fears and disbelief when faced with the realities

of an encounter with law enforcement."); Barack Obama, *A Promised Land*, at 395-

96 (2020) ("Hearing about what had happened to [Professor Henry Louis] Gates[,

Jr.], I had found myself almost involuntarily conducting a quick inventory of my

own experiences.  The multiple occasions when I'd been asked for my student ID

while walking to the library on Columbia's campus, something that never seemed to

---

distressing, is extremely educational and important.  And in my view, it is even more so for judges
who must place themselves in the shoes of reasonable innocent citizens under the hybrid "free to
leave"/affirmative-acts-of-coercion test.

happen to my white classmates.  The unmerited traffic stops while visiting certain 'nice' Chicago neighborhoods.  Being followed around by department store security guards while doing my Christmas shopping. . . .  For just about every Black man in the country, and every woman who loved a Black man, and every parent of a Black boy, it was not a matter of paranoia or 'playing the race card' or disrespecting law enforcement to conclude that whatever else had happened that day in Cambridge, this much was almost certainly true:  A wealthy, famous, five-foot-six, 140-pound, fifty-eight-year-old *white* Harvard professor who walked with a cane because of a childhood leg injury would *not* have been handcuffed and taken down to the station merely for being rude to a cop who'd forced him to produce some form of identification while standing on his own damn property.").

Indeed, the evidence shows that Black Americans share concerns about interactions with the police "regardless of station in life or standing in the community." *Jamison*, 476 F. Supp. 3d at 414-15 (collecting examples).  So Black citizens are less likely to feel free to walk away from the police and exercise their rights, *see* Devon W. Carbado, *From Stopping Black People to Killing Black People: The Fourth Amendment Pathways to Police Violence*, 105 Calif. L. Rev. 125, 142 (2017) ("Black people, across intraracial differences, are likely to feel seized earlier in the police interaction than whites, likely to feel 'more' seized in any given

35

moment, and less likely to know or feel empowered to exercise their rights."), under circumstances where white citizens would have no such qualms.

Even the Supreme Court has suggested as much. As the panel opinion acknowledges, the Court has held that race can be relevant when analyzing the related but subjectively analyzed Fourth Amendment question of whether a suspect has voluntarily consented to a search or seizure. *United States v. Mendenhall*, 446 U.S. 544, 558 (1980).

It's worth considering why. In my view, the Supreme Court accounts for race in this subjective test because it has perceived that, as a result of Black Americans' shared historic experience in police encounters, purported "consent" is less likely to be truly voluntary when attributed to Black individuals than to white ones. And if that is so, it is difficult to understand why that same shared experience would not be equally relevant to whether a Black citizen truly feels "free to leave" a police encounter—especially because the Supreme Court has explicitly stated that the seizure test and voluntariness test "turn on very similar facts." *United States v. Drayton*, 536 U.S. 194, 206 (2002). As the Court has emphasized, "the question of voluntariness pervades both . . . inquiries." *Id.*

So it seems pretty clear that a shared historical Black experience can cause Black Americans to view their ability to leave a police interaction very differently than white Americans. All Americans—regardless of race—have a right to the equal

36

protection of the law and to the ability to exercise their constitutional rights. So I would conclude that the need for citizens to in fact enjoy an equal ability to assert their Fourth Amendment rights in citizen-police encounters represents a compelling interest.

But that is not the end of the equal-protection analysis. Rather, we must consider whether accounting for race in the objective test for determining whether a Fourth Amendment seizure has occurred is narrowly tailored to address the compelling interest at issue here. A racial classification will satisfy the narrow-tailoring requirement only if "race-neutral alternatives that are both available and workable do not suffice." *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198, 2208 (2016) (citation and internal quotation marks omitted). And that's where considering race runs into a constitutional problem. It is not narrowly tailored.

That is so because a more narrowly tailored solution that is race-neutral exists: the Supreme Court could institute a bright-line rule that would require officers to advise citizens whether they are free to leave before questioning begins. *See infra* Section IV. Because consideration of race in the objective Fourth Amendment analysis cannot survive strict scrutiny, we cannot account for race under the current "free to leave"/affirmative-acts-of-coercion test.

Yet studies indicate there's no real question that Black citizens are not well covered by the "free to leave"/affirmative-acts-of-coercion test's hypothetical

37

reasonable person.  Put simply, citizens who believe that when they "question the authority of the police, the response is often swift and violent," Maclin, *supra*, at 253; *Commonwealth v. Hart*, 695 N.E.2d 226, 228 (Mass. App. Ct. 1998) ("[H]istorically . . . blacks who have walked, run, or raced away from inquisitive police officers have ended up beaten and battered and sometimes dead."), do not view themselves as having a choice to leave or end a police encounter in a situation like Knights faced.  Rather, they consider themselves seized.

In short, courts, citizens, and police continue to wrestle with the inherent ambiguity in so-called consensual stops—sometimes with devastating results.  We can do better.  So I turn to a proposed solution to remove this ambiguity, to protect citizens and officers alike during intended consensual encounters, and to reaffirm the Fourth Amendment's guarantee against unreasonable seizures.

## IV.

The troubles with the "free to leave"/affirmative-acts-of-coercion test I have outlined above stem from the inherent ambiguity in so-called consensual encounters. Removing that ambiguity would help render so-called consensual encounters safer for everyone.  It would also assist in preserving Fourth Amendment rights.

To accomplish this, the Supreme Court could require officers who wish to engage in consensual interactions—at the very least with respect to those individuals an officer wants, without reasonable suspicion, to investigate in some way—to, at

38

the outset, inform the approached individual that he or she may decline or end the interaction without penalty. While not perfect, this solution has the benefit of establishing a bright line so both citizens and officers know that any continued interaction is presumed consensual.

Below in Section IV.A, I explain why the Court should reconsider adopting a bright-line rule to evaluate police-citizen encounters under the Fourth Amendment. In Section IV.B, I analogize this idea to the approach the Court has taken in the Fifth Amendment context and show how a similar rule in the Fourth Amendment context would begin to remedy the problems identified in Sections II and III. And in Section IV.C, I address the criticisms of adopting a bright-line rule.

## A.

I am aware the Supreme Court has previously dismissed this and other courts' suggestions to adopt a Fourth Amendment version of the *Miranda* rule for dividing consensual from non-consensual interactions. More specifically, in a pair of cases, we opined that when the totality of the circumstances suggests—but does not establish—that the citizen is not free to leave, officers must inform citizens of their rights. *United States v. Guapi*, 144 F.3d 1393, 1393–95 (11th Cir. 1998); *United States v. Washington*, 151 F.3d 1354, 1355–57 (11th Cir. 1998).[9] The Supreme Court rejected that approach, explaining that the touchstone of Fourth Amendment

---

[9] Both abrogated by *United States v. Drayton*, 536 U.S. 194 (2002).

jurisprudence has always been a reasonableness assessment. *Drayton*, 536 U.S. at 201–203. Instead, the Court reaffirmed that the totality-of-the-circumstances test governs whether a reasonable person would have felt free to terminate the encounter. *Id*.

But many years have passed since we last suggested a bright-line test should identify whether so-called consent is in fact consensual in any given circumstances. During that time, the "free to leave"/affirmative-acts-of-coercion test has continued to create unnecessary risks to officers and the citizens with whom they speak, while chipping away people's confidence in their Fourth Amendment rights.

And what is the value of continuing to make people guess? Whatever it may be, does it outweigh the dangers to officers and citizens alike caused by requiring citizens to guess whether they are "free to leave"? I think not.

With these thoughts in mind, I respectfully propose that we proceed from the premise that the "free to leave" test—a seizure occurs when a reasonable innocent person would not feel free to leave—should mean what it says. After all, a nation governed by the rule of law derives its legitimacy in part from the transparency of the law and the ability of the citizens to understand and rely upon that law. To further that principle, the Court should once again consider adopting a bright-line rule to make the "free to leave" test correspond with reality when no reasonable suspicion supports a stop.

**B.**

The Supreme Court has successfully adopted a bright-line rule in the Fifth Amendment context. *Miranda v. Arizona*, 384 U.S. 436 (1966). Much like the "free to leave" test, the pre-*Miranda* voluntariness test considered nearly every factor. *Id*. at 508 (1966) (Harlan, J., dissenting) (collecting cases).

But in *Miranda*, the Court abandoned that totality-of-the-circumstances-based test in favor of the now-familiar rule requiring a person in custody to "first be informed in clear and unequivocal terms that he has the right to remain silent." *Id.* at 467-68. Among other things, the Court held that "such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere." *Id.* at 468. So the Court determined it would no longer "pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given." *Id*. It further noted that the explicit "warning will show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it." *Id.*

A bright-line rule for ascertaining whether an encounter is consensual or whether instead a seizure has occurred under the Fourth Amendment would work much like the *Miranda* rule. If an officer fails to inform a citizen at the outset of the interaction that the citizen is free to decline the interaction, a "bright-line legal presumption" will arise that a seizure has occurred under the Fourth Amendment.

41

*See Oregon v. Elstad*, 470 U.S. 298, 306 n.1 (1985) ("A *Miranda* violation does not *constitute* coercion but rather affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements."). Conversely, if an officer does give the warning, a presumption follows that the interaction was consensual (and therefore not a seizure), unless evidence shows that the citizen was, in fact, not free to leave. *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("We do not suggest that compliance with *Miranda* conclusively establishes the voluntariness of a subsequent confession.").

A *Miranda*-type solution neatly fits Fourth Amendment consensual encounters. While the Fifth Amendment privilege not to incriminate oneself differs from the right under the Fourth Amendment not to be seized except when the seizure is "reasonable" (and therefore the corresponding right to decline to interact with an officer unless one has been "reasonabl[y]" seized), applying a totality-of-the-circumstances test raises the same practical problems in both contexts. In fact, many of the difficulties with the old Fifth Amendment totality-of-the-circumstances test that the Supreme Court identified in *Miranda* are troubles that beset the totality-of-the-circumstances hybrid "free to leave"/affirmative-acts-of-coercion test.

First, judges determining voluntariness in the pre-*Miranda* era could not experience firsthand "the inherent pressures of the interrogation atmosphere." *See* George C. Thomas III, *The End of the Road for Miranda v. Arizona?: On the History*

*and Future of Rules for Police Interrogation*, 37 Am. Crim. L. Rev. 1, 7 (2000) ("How would a court, months or years later, be able to discern whether a confession sufficiently manifested the will of the suspect?"). The same challenge arises when courts try to ascertain whether the hypothetical reasonable innocent person feels free to leave. Courts are too removed from the actual circumstances and pressures a reasonable person in the citizen's place would have felt in interacting with police.

Second and somewhat relatedly, the pre-*Miranda* voluntariness test, like the hybrid test, required assessments that could "never be more than speculation . . . ." *Miranda*, 384 U.S. at 468-69. That speculation led in pre-*Miranda* Fifth Amendment cases to unpredictable results, making it difficult for citizens, police officers, and courts to know in the moment whether an interrogation would later be considered consensual. Courts' necessary speculation under the current hybrid test causes the same unpredictability problem for citizens and officers in the consensual-police-encounter realm.

Third, employing an artificial reasonable person as the benchmark arguably tended to disproportionately disadvantage Black individuals under both the voluntariness and the "free to leave" tests. Although the *Miranda* opinion does not focus on race, Chief Justice Warren originally expressed this concern when he authored *Miranda*. Indeed, "an early draft of Warren's *Miranda* opinion had called attention to the large number of black defendants who had been subjected to physical

43

brutality by Southern police." Yale Kamisar, *On the Fortieth Anniversary of the Miranda Case: Why We Needed It, How We Got It—and What Happened to It*, 5 Ohio St. J. Crim. L. 163, 175 (2007).[10]

Fourth, the pre-*Miranda* voluntariness test, much like the "free to leave"/affirmative-acts-of-coercion test, could "exact[] a heavy toll on individual liberty and trade[] on the weakness of individuals." *Miranda*, 384 U.S. at 455. The voluntariness test also failed to "dispel the compulsion inherent in custodial surroundings . . . ." *Id*. at 458. Similarly, as I have explained, the Fourth Amendment's hybrid test continues to ignore the inherent coerciveness of police encounters, a problem that is particularly acute for Black citizens.

As with *Miranda*, a bright-line rule requiring law enforcement to inform an approached person of that individual's right to decline the interaction would go a long way towards remedying many of these problems. No longer would we spend time speculating as to just how difficult it would have been for Knights to have maneuvered his car around the officers and their cruiser (if his car were not dead). Nor would we be called upon to decide whether using a flashlight in the dark makes the encounter more coercive. Or whether the presence of two officers versus one or

---

[10] Chief Justice Warren dropped this language after Justice Brennan suggested that poverty, more than race, characterized those who suffered police brutality. *Id*. Whatever the specific inequality, a constitutional rule that fails to reflect the realities of society and creates inequitable results deserves a second look.

three would have made Knights feel less free to leave.  We also would not be required to sweep under the rug the officers' actual intentions or the real fear that many reasonable people often feel in police encounters.  Instead, we would simply ask, "Did the officers inform the defendant of his right to leave?"  And "Did the defendant attempt to exercise his right to do so?"

An explicit "warning will show the individual that [the police] are prepared to recognize his [right to walk away] should he choose to exercise it."  *Miranda*, 384 U.S. at 468.  As a matter of safety to the officer and to the citizen, that knowledge and clarity is extremely important.  Here, ambiguity can result in physical injury and even death.   The *Miranda* bright-line approach is a solution that would help minimize many of these problems.

## C.

Despite the overwhelming benefits of a bright-line rule, some might argue that requiring pre-questioning warnings is inappropriate in the Fourth Amendment context.  Others might dismiss pre-questioning warnings in the Fourth Amendment context out of a concern that they might hinder legitimate law-enforcement activity. As they were with *Miranda* warnings, these criticisms are ultimately unavailing.

I begin with the criticism that employing *Miranda*-like warnings is unnecessary because the rights protected by the Fourth Amendment differ from those protected by the Fifth Amendment.   The Supreme Court relied on this

45

distinction as a reason, among others, to reject requiring a warning in the consent-search context. *Schneckloth v. Bustamonte*, 412 U.S. 218, 241–42, 249 (1973). There, the Court reasoned that trial rights, such as the Fifth Amendment right not to make a compelled statement, are necessary to ensure an "unfair result" is not reached at trial. *Id.* at 241-42. But the Court distinguished the Fourth Amendment as a device that protects privacy.

Yet the Fifth Amendment right against self-incrimination also helps secure other important constitutional values that other constitutional provisions, including the Fourth Amendment, guard. In fact, *Miranda* critically noted that the Fifth Amendment privilege protects privacy and "the respect a government . . . must accord to the dignity and integrity of its citizens." *Miranda*, 384 U.S. at 460. These values apply with equal force in the Fourth Amendment context.

Not only that, but the Fourth Amendment's protection of an individual's privacy from government intrusion also affects the ability of courts to maintain a fair trial. The Court adopted the exclusionary rule primarily to protect the rights enshrined in the Fourth Amendment. If evidence illegally obtained can be used at trial, then "the protection of the Fourth Amendment . . . is of no value[.]" *Weeks v. United States*, 232 U.S. 383, 393 (1914), *overruled on other grounds by Mapp v. Ohio*, 367 U.S. 643 (1961). A fair trial is not one that can be "aided by the sacrifice of [the Fourth Amendment's] great principles . . . ." *Id.* A fair trial demands putting

46

the government to its paces by requiring the government to "produce the evidence against [the defendant] by its own independent labors," *Miranda*, 384 U.S. at 460, not by obtaining evidence through illegal means or compulsion.

A bright-line rule here is also not inconsistent with the Fourth Amendment's reasonableness approach. In fact, we observe bright-line types of rules in assessing whether searches without warrants are reasonable. For example, a search warrant is categorically unnecessary in certain exigent circumstances. *See Missouri v. McNeely*, 569 U.S. 141, 150 n.3 (2013) (citing *California v. Acevedo,* 500 U.S. 565, 569–570, (1991) (automobile exception); *United States v. Robinson,* 414 U.S. 218, 224–235, (1973) (searches of a person incident to a lawful arrest)) ("We have recognized a limited class of traditional exceptions to the warrant requirement that apply categorically and thus do not require an assessment of whether the policy justifications underlying the exception, which may include exigency-based considerations, are implicated in a particular case.").

That is so because the Supreme Court has made a judgment that, in these circumstances, it is pretty much always reasonable to conduct a search, even without a warrant. Similarly, adopting a bright-line rule in the consensual-encounter context would mean only that the Supreme Court has decided that it is presumptively unreasonable to assume consensual a police encounter where the officer seeks to

investigate the citizen with whom he wants to speak if the person has not first been advised of his right to decline.

I am also attuned to the Court's concern—understandably shared by police officers working in challenging, dangerous jobs—that imposing a bright-line rule in the Fourth Amendment context could impose a cost, since people might not consent to a police interaction if advised that they not need do so. And to be sure, in *Schneckloth*, the Court reasoned that consent searches, much like consensual questioning, can "yield necessary evidence for the solution and prosecution of crime . . . ." *Schneckloth*, 412 U.S. at 243.

But a warning advising a person of her rights is not mutually exclusive with law-enforcement cooperation. It simply ensures that cooperation with law enforcement is truly consensual. Though "it is no part of the policy underlying the Fourth . . . Amendment[] to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals," *id.* (cleaned up), informing a person possibly subject "to a governmental intrusion . . . that she has a right to say no," Carbado, *(E)racing*, *supra*, at 1027, does not conflict with that policy concern.

Indeed, this was the same criticism levied when the Court issued *Miranda*. *Miranda*, 384 U.S. at 516–17 (Harlan, J., dissenting). But those concerns turned out to be unwarranted, as there is "wide agreement that *Miranda* has had a negligible

48

impact on the confession rate." Kamisar, *supra*, at 177.[11]  One study concluded that immediately after *Miranda* issued, it may have caused a 4.1 percent drop in the confession rate, which translated to just a 0.78 percent drop in the conviction rate. Thomas & Leo, *supra*, at 240.

But those who have researched this issue have concluded that even those negligible losses have likely been reversed because police have learned how to adhere to *Miranda* and still obtain confessions.  *Id*.  Surveys of criminal-justice practitioners have confirmed that "*Miranda* was not a significant factor that impedes [a prosecutor's] ability to prosecute criminals successfully."  *Id*. at 254.

And Kessler's research suggests the same would be true if a bright-line rule were applied in the Fourth Amendment context.  Even when people were advised of their right to leave a police encounter, in the survey Kessler conducted, most still reported that they would not be likely to do so.  *See* Kessler, *supra*, at 78-79 (noting 40% of people reported a 1 or a 2 (out of 5), and two-thirds reported a 3 or lower on the comfort scale).

Law enforcement equally benefits from bright-line rules because agencies "strongly prefer that their officers work within a framework of articulable standards

---

[11] One commentator has argued that *Miranda* had an appreciable effect on the ability of law enforcement to obtain confessions, but his findings "have not been generally accepted in either the legal or the social science community."  George C. Thomas III & Richard A. Leo, *The Effects of Miranda v. Arizona: "Embedded" in Our National Culture?*, 29 Crime & Just. 203, 244 (2002) (collecting sources criticizing that commentator's methodology and conclusions).

49

. . . ." Corey Fleming Hirokawa, Comment, *Making the 'Law of the Land' the Law on the Street: How Police Academics Teach Evolving Fourth Amendment Law*, 49 Emory L.J. 295, 296–97 (2000). Even when courts set vague balancing tests, "police departments are likely to respond by setting clear, specific rules for their officers that keep them well within the zone of constitutional action . . . ." *Id.*

In fact, some officers already issue pre-questioning warnings to citizens they encounter on the street. *See*, *e.g.*, *Pastor v. State*, 498 So. 2d 962, 963 (Fla. Dist. Ct. App. 1986), *quashed on other grounds*, 521 So. 2d 1079 (Fla. 1988); *cf. United States v. Czichray*, 378 F.3d 822, 825 (8th Cir. 2004); Carbado, *(E)racing*, *supra*, at 1029 (noting that "federal agents were already in the practice of giving . . . warnings" before conducting consent searches) (internal quotation marks omitted). Besides demonstrating the efficacy of the practice, this fact also suggests that requiring officers to advise citizens they are free to decline an interaction will not materially affect law enforcement's abilities to obtain cooperation from citizens.

Of course, a bright-line rule is not a panacea. Citizens may still feel uncomfortable leaving interactions with the police, as Kessler's study demonstrates. But a bright-line rule would eliminate the ambiguity that plagues the current hybrid test. It would also provide a clear framework for citizens, officers, and courts to determine when a seizure has occurred. While not a perfect solution, a bright-line rule would take a big step towards reflecting the realities of police-civilian

50

interactions and making them safer for both officers and citizens.  And this race-neutral rule would help remedy the racial disparities I have described, assisting in making Fourth Amendment rights in consensual encounters more of a reality for all citizens.

## V.

Our panel decision follows the law, but the law we applied is ripe for change. The "free to leave"/affirmative-acts-of-coercion test ensures that police-citizen encounters are rife with dangerous ambiguity.  It also, on occasion, "reduces the Fourth Amendment to a form of words," *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920), by allowing unreasonable seizures to occur, even if the reasonable citizen or officer does not view the encounter as consensual.

To fix the problems inherent in the current seizure analysis, we should adopt a bright-line rule.  True, the Supreme Court has previously rejected the bright-line rule approach in the Fourth Amendment context.  But in the intervening time, it has become clear that the "free to leave"/affirmative-acts-of-coercion test is dangerous and unworkable.  And research studies, real-life experiences, and common-sense principles demonstrate that a bright-line rule could greatly improve the situation with little to no downside.  I therefore respectfully urge the Court to reconsider its earlier position and to adopt a bright-line rule.

51